## JAMES BOOTH BARNETT V. STATE

No. 28,248. April 25, 1956.

Appellant's Motion for Rehearing Overruled
(Without Written Opinion) May 30, 1956.

*Peden, Stevens & Ludtke,* by *O'Brien Stevens,* Houston, for appellant.

*Dan Walton,* District Attorney, *Eugene Brady, Thomas D. White, Joe S. Moss, C. C. Castles,* Assistants District Attorney, Houston, and *Leon Douglas,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

The conviction is for robbery with firearms; the punishment, seven years.

The evidence conclusively shows that Johnny Will Horn, a Negro, entered a place of business in Houston known as La Rose Cleaners shortly after six o'clock P.M. on December 20, 1954. He was armed with a pistol, and by threat to use it required the lady in charge to open the cash register from which he took the money and placed it in his cap.

The lady in charge and a lady customer who arrived during the holdup were required to cover their heads and, after the robbery, were marched out the side door and down the street.

Several shots were fired after they left the building and the lady customer and a third lady were shot in the back by Horn.

Horn testified as a witness for the state, admitting the robbery and implicating appellant.

According to Horn's testimony the pistol used belonged to appellant; they were drinking together and agreed to rob several places, including the La Rose Cleaners; they went to the scene in appellant's station wagon, Horn driving at the time, and appellant waited while he, Horn, entered; that appellant signaled to him during the robbery.

According to Horn, when he marched the women out of the building, through the side door, appellant was in the station wagon and he delivered to him the fruits of the robbery.

The ladies testified that they encountered a car in the vicinity of the side door soon after they were marched out, but could not see it because their heads were covered.

Appellant, a white man, did not testify and all of the evidence heard on the trial came from witnesses for the state.

The jury was charged that Johnny Will Horn was an accomplice witness whose testimony required corroboration and was required, in order to convict, to find that appellant was present and advised or agreed to the commission of the robbery or aided in its commission. Also the jury was instructed to acquit in the event of a reasonable doubt as to whether appellant was present or had agreed with or advised Horn to commit the offense.

Appellant urges the insufficiency of the evidence to corroborate the testimony of the accomplice witness Horn, and points to the fact that appellant assisted in apprehending Horn and to the explanation made by appellant, as shown in the testimony of R. H. Brannon.

Other testimony, aside from that of the accomplice witness Horn and the statements attributed to appellant by Brannon, which tend to show appellant's association with Horn and which the state urges tends to connect him with the commission of the robbery, includes the following:

Police Officer Bond visited Bob Barnett's Christmas tree lot where Horn was employed on December 20, and soon thereafter discovered that a 38-44 pistol in a black spring holster was missing from the glove compartment of his car.

Appellant was identified by a clerk in a liquor store as the white man who came to the store between 2 and 3 P.M. in a station wagon in company with a colored man who bought a half-pint of whisky.

When the colored man returned to the station wagon the clerk saw appellant looking at a pistol, he then "passed it over to the Negro and he looked at it and handed it back to Mr. Barnett." They left together in the station wagon.

Milton Steinburg testified that appellant came to his pawn shop about 5 P.M. and purchased shells and fitted them into a pistol he had. Horn came into the store also and said he worked for appellant who had a car lot.

Appellant and Horn came to Thelma Robinson's cafe for colored people where appellant was introduced by Horn as "his boss, Mr. Peterson." Appellant was identified as the person so introduced and who stated that he was on the police force; had been for the past 20 years; had an office of his own in the city hall and was "over the Homicide."

Also, according to the witness Thelma Robinson, appellant said "If you need a lawyer look me up," and he "had on a gun."

Appellant and Horn remained in the cafe from 5:30 until 6:02 P.M. The witness testified that appellant and Horn kept watching the clock; that a few minutes before they left appellant said "Let's go" and Horn replied "That's okay boss. We have ten minutes yet."

Appellant came back to the cafe between 7 and 7:30 and asked Thelma Robinson if she had seen Johnny Horn since he left, and he talked to Johnny Horn's brother, Joe.

Joe Horn testified that appellant asked him if he had seen Johnny, and said "If you see Johnny tell him to meet me at the used car lot as quick as possible" and appellant bought him a beer.

There was some conversation about the robbery of the La Rose Cleaners and appellant, according to Joe Horn, got red in the face and left without finishing his beer. Appellant stated also "I have a hundred and some dollars that belongs to Johnny in my pocket."

Joe Cortez testified that it was twenty or thirty minutes after the robbery and some five minutes after the excitement had died down that he saw appellant in front of his store and "told him about the excitement that he missed of the hijacking," and it looked to him like that was the first he had heard of it.

Brannon, a city detective at the time of the robbery, testified that he had been acquainted with appellant for several years; that about 10 A.M. on December 21, 1954, he was at the police station and received a telephone call from appellant in which he said "I think I know who shot those two women last night." "If you come out here by yourself—I will point the Negro out to you."

Brannon said he could not come alone, but must bring his partner. Appellant agreed to this and told Brannon to meet him at Shorty's Barbecue on Wallisville Road as soon as he could get there, and they left immediately and met him there.

Appellant then stated that he knew where the Negro was that he thought shot the two women the night before and said he would go and get the Negro, but wanted his name kept out of it and wanted to do it his own way because the Negro had a gun and he didn't want anyone to get shot.

Appellant, during this conversation, also told Brannon that "he went to the Christmas tree lot on South Main the previous evening where he met this Negro, Johnny Horn, and another Negro by the name of Langerson, and that they had several drinks out of a pint of whiskey. He said that they drank that pint of whiskey. He said that he and Horn drove around in his car, and Horn showed him a pistol, a bright shiny one, that he had won in a crap game, and Jim told me that * * * he was feeling pretty good, so by that time he fired the pistol out of the car window a couple of times in the vicinity of Sears and Roebuck on Main Street, and he said that later on he took the Negro back over on Lyons Avenue with him, and the Negro told him that he had some clothes in the cleaners that he wanted to pick up, and that he asked him to take him to the cleaners, and he took him to the cleaners, the LaRose Cleaners on Lyons Avenue there, and let him out in front of the cleaners. * * * He said he took him to the LaRose Cleaners on Lyons and Hahlo there, and let him out in front of the cleaners. He said that he had no idea * * * that previous to this he had asked Johnny Horn to give him the gun. He told him that he had never given him anything for a Christmas present, and it was close to

Christmas, and he wanted him to give him the pistol for a Christmas present, and he said that he was under the impression that when Johnny Horn got out of the car that he left the pistol under the seat. * * * He told me * * * He said, 'Hell, Bob, I even ribbed the Negro about that he could get some Christmas money with this pistol.' "

Brannon testified that appellant told him "that on the morning after the hijacking he had went to a grill on Telephone, and went in there for a cup of coffee, and he said when he came back there the Negro was in the car, and while he was in this Telawink Grill he had read in the paper about the hijacking of the LaRose Cleaners on Lyons, and when he came back Johnny Horn was sitting in the car, and he immediately suspicioned that Horn was the one that had committed it. * * * So he said that he took him to the house on Lockwood where he let him out, and that is the reason he knew where the Negro was."

Brannon further testified: "So we agreed that he should go and get the Negro, and we would wait around the corner until he brought the Negro back to the place. * * * So we waited, and he went and got the Negro and brought him back to the place, and whenever we seen them drive up in the yard we drove up by the side of the car, and I got out, and he said, 'Hi, Bob. What are you doing out here?' And I told him that there had been a hijacking the previous night and we were looking for the Negro who committed it, and he said, 'Well, you know Horn here.' He said, 'He works for me.' He said, 'He was with me all night last night, and I can vouch for what he was doing; that he wasn't involved in anything.' And I told him that we would have to take Horn to the station and check him out. We got him out of the car and searched him and put him in the police car and took him to the police station. When we placed him in the showup a lady identified him as being the one that was in the hijacking."

On cross-examination Brannon testified that, in connection with his statement that he had told the Negro he could make some Christmas money with the pistol, appellant stated that he did not think Horn would do it; that appellant stated that he first learned there had been a "hijacking" at the LaRose Cleaners after he drove around the corner to Burt's Food Market and Joe Costa told him about it; that when Horn got out of the station wagon at LaRose Cleaners appellant stated that he thought the pistol was under the seat and did not discover it

was gone until the next morning; that appellant further stated that Horn had turned over to him for safe keeping about $200.00 and that after he let Horn out he got in a "crap game" and lost Horn's money.

Thereafter, appellant surrendered the pistol used in the robbery to Officer Brannon and gave him $28.10 in silver which he said was money that Horn had earned at the Christmas tree lot, and one of his attorneys returned the holster to Officer Bond.

The state relies upon the statement made by appellant to Officer Brannon to the effect that he and Horn were riding together and drinking together and that he took Horn to the place that was robbed and let him out there; that he had "ribbed the Negro that he could made some Christmas money with that pistol by hijacking some place;" that he was in company with Horn the next morning and took him to the house on Lockwood where the pistol was hidden and let him out.

Appellant points to other portions of the statement attributed to him by the witness Brannon, which are claimed to be of an exculpatory nature, such as the statement that Horn had given him the pistol and that he thought Horn left it under the car seat; that he didn't think Horn would do it when he remarked that he could make some Christmas money with the pistol; that he took Horn to the LaRose Cleaners because he said he wanted to pick up his clothes, and that he first learned of the robbery when he drove around the corner to Burt's Food Market and was told by Joe Costa that there had been a hijacking at the LaRose Cleaners.

It is significant to note that appellant made no explanation to Officer Brannon, in his conversation with him, as to his whereabouts from the time he took Horn to the cleaners to pick up his clothes until he drove around the corner and talked to Cortez some twenty or thirty minutes later, and no explanation of why, if he took Horn to the cleaners to pick up his clothes, he drove away before Horn returned with them.

Appellant cites a number of authorities where the evidence was held to be insufficient to corroborate the testimony of the accomplice witness, such as Carter v. State, 104 Tex. Cr. R. 163, 283 S.W. 174.

The state, on the other hand, cites a number of cases where

this court found the corroboration sufficient, principally the case of Hawkins v. State, 124 Tex. Cr. R. 23, 60 S.W. 2d 227.

The facts of each case must be looked to in determining the question of sufficiency of the evidence to corroborate the testimony of the accomplice witness.

The rule regarding the sufficiency of evidence to corroborate the testimony of an accomplice witness which is here applicable may be found in Minor v. State, 108 Tex. Cr. R. 1, 299 S.W. 422, 429, and is quoted in Hawkins v. State, 124 Tex. Cr. R. 23, 60 S.W. 2d 227, supra, as follows:

"Circumstances proved by credible witnesses may be as potent as direct testimony in tending to connect the accused with the commission of the offense. The state is not called upon to point to some single or isolated fact which in itself, unrelated to other proven facts, will be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supplies the test. If by this rule it appears on appeal that before the jury there was proof confirming the testimony of the accomplice to material facts tending to connect the accused with the commission of the offense, the law is satisfied."

It is evident that the jury chose to accept the state's version that appellant agreed to the commission of the offense and accompanied the robber to the scene, and the evidence, viewed in the light most favorable to the state, is deemed sufficient to corroborate the testimony of the accomplice witness that he did so agree and was present when the offense was committed.

The remaining ground for reversal relates to the refusal of the trial court to entertain an amended motion for new trial alleging jury misconduct.

The motion for new trial was presented to the trial judge on February 3, 1956.

The original motion for new trial was overruled by the court on November 18, 1955, and appellant then excepted, gave notice of appeal and sentence being pronounced entered into recognizance on appeal.

It is upon this notice of appeal entered on November 18, 1955, that the jurisdiction of this court is invoked, and upon the

recognizance of that date that appellant is enlarged to abide the judgment of this court.

The trial court certifies that the notice of appeal was not withdrawn and declined to certify that the motion was tantamount to and its filing would constitute a withdrawal of the appeal.

We find no abuse of discretion on the part of the trial judge in declining to entertain the amended motion for new trial presented long after notice of appeal had been entered and which notice of appeal had not been withdrawn. See Heath v. State, 161 Tex. Cr. Rep. 323, 276 S.W. 2d 534; Martin v. State, 153, Tex. Cr. R. 470, 221 S.W. 2d 605.

The judgment is affirmed.