Claude Dean EDWARDS, Appellant,

v.

The STATE of Texas, Appellee.

No. 41108.

Court of Criminal Appeals of Texas.

March 27, 1968.

Rehearing Denied May 8, 1968.

Charles E. Brownfield, Jr., Stamford, and R. E. Thornton of Thornton, Thornton & Fisher, Olney, by appointment, for appellant.

T. J. Rodgers, Dist. Atty., Graham, and Leon B. Douglas, State's Atty., Austin, for the State.

OPINION

ONION, Judge.

The offense is Murder with Malice; the punishment, death. Appellant's trial was conducted in Young County following a change of venue from Stephens County.

In his first four grounds of error appellant urges that the evidence to corroborate the testimony of the accomplice witness is not sufficient to sustain the jury's verdict.

Arthur Eugene McCain, called as a witness by the State, testified to an intricate sequence of events involving appellant, one Ronnie Wilhelm, and himself beginning July 3, 1966, and ending July 7, 1966, when they were arrested. The three men were together at practically all times. His testimony is summarized as follows:

McCain was at his mother's house near Mangrum, Texas on July 3, 1966, with appellant and Wilhelm whom he had known for seven or eight years. The three men left the house at 10:00 a. m. in McCain's mother's 1947 Chevrolet to travel to Ivan, Texas for the purpose of attempting to secure a 1959 Oldsmobile belonging to Ronnie Wilhelm's father, Irby Wilhelm, for a planned trip to San Antonio. The three arrived at Foots-Collins beer joint in Ivan at approximately 1 p. m. and met Irby Wilhelm and Eva Bradford. A six-pack of beer was purchased and at 1:30 the five adjourned to Eva Bradford's house near Graham, Texas. During their stay, McCain showed a .38 caliber revolver to the rest of the group and subsequently the gun was test-fired outside until there were only three cartridges remaining, one lead and two steel jackets. Wilhelm's father showed some interest in the purchase of the pistol but after consultation the three decided not to sell as the pistol would be needed for a planned robbery. Consent was then obtained from Irby Wilhelm to use his 1959 Oldsmobile, and in said car the three left and returned to the Foots-Collins Place, arriving at approximately 3 p. m. Staying only several minutes, they resumed their travels and arrived in Ranger, Texas near 4 p. m. to visit with McCain's aunt, May Kitchens. They stayed there only about 5 minutes before going to an ice house in Ranger to buy some beer. Upon being refused by Clarence Mitchell, the proprietor, in their request to purchase beer, the three departed at approximately 5:30 p. m. and returned to McCain's mother's house. They rested there until approximately 1 a. m., July 4, 1966, at which time they left to go to Breckenridge, Texas to rob a service station. They arrived in Breckenridge at approximately 2 a. m. and stopped at a service station, filled the car with gasoline and had the oil checked. They then drove past the Reed Oil Station at which time Wilhelm stated, "That's the station we're going to rob," and the appellant (Edwards) said, "We're going to have to kill the son-of-a-bitch to keep him from identifying us." They then drove out to the Necessity Road turnoff where they decided that they would leave the attendant after the robbery. As they again drove past the Reed Oil Station on the way to the Maridee Motel Coffee Shop in Breckenridge, the appellant observed the attendant and stated, "I know the guy." * * * "I don't mind killing that son-of-a-bitch, because he has caused me plenty of trouble." They arrived at the Maridee Coffee Shop at approximately 2:30 a. m. While there appellant and a waitress had an argument; they ate some food and departed at 2:50 a. m. to carry out their previous plans. The three men drove past the Reed Oil Station several times waiting for a customer to leave, then they drove in. With the .38 caliber pistol appellant forced the deceased, Clarence Swaim, the sole attendant at the Reed Oil Station, into the automobile where McCain held a .22 rifle on him while Wilhelm emptied the cash register. After causing the deceased to remove his cap and his eye glasses so that he would not be easily recognizable, they traveled to a field near the Necessity Road cutoff where the appellant shot the deceased three times with the .38 caliber revolver and Wilhelm contributed seven or

eight shots from a .380 caliber automatic pistol which Wilhelm had taken from the deceased moments earlier. Shortly after leaving the scene of the killing, the money taken during the robbery, being approximately $260, was divided among the three men. They then proceeded by back roads to McCain's mother's house where they obtained some clothing and secured some rifles which had been "stashed" away at such place. Then they proceeded again by back roads, some of them being dirt ones, to Comanche and then to Hamilton and then on to San Antonio. While en route to San Antonio the three stopped at a service station just outside of Hamilton, Texas at approximately 6:15 on the morning of July 4, 1966, and filled the car with gasoline and had the oil checked. At 9 a. m. they entered the Travis Motel in San Antonio seeking a room but none was available at the time. An hour later they rented a room at the Mayfield Motel in San Antonio and on July 5, 1966, at approximately 12:30 or 1 p. m. they checked out of the Mayfield Motel and rented a room at the Maria Motel, also located in the city of San Antonio. On that same date the three men attempted to trade the deceased's .380 automatic pistol on a newer one at a pawn shop located in San Antonio but being unable to do so, decided to hide both the .38 caliber revolver and the .380 automatic pistol. The three men were arrested in San Antonio on July 7, 1966, and shortly thereafter McCain led the police officers to the hidden pistols which were recovered at that time.

To corroborate the testimony of the accomplice McCain, the State offered the following: Dr. B. B. Trotter testified that Clarence Swaim, the deceased, was killed by multiple gunshot wounds from .38 and .380 caliber pistols. Numerous witnesses testified to the discovery of the deceased's body sometime between 8:30 and 9 a. m. on July 4, 1966, lying in a field outside of Breckenridge with his eye glasses in his pocket and his shoulder holster empty. Donald F. Melton, a local mortician who viewed the body between 9:30 and 9:45 a.

m. on July 4, 1966, testified that based upon his experience and training the deceased had been dead about seven or eight hours.

McCain's testimony outlining the July 3, 1966, itinerary as to time and place that the three men were together was fully corroborated by numerous witnesses who positively identified them in the 1959 Oldsmobile they were driving. They were seen in the presence of each other practically at all times.

The three men were not again identified until the early morning hours of July 4, 1966, at approximately 2 a. m. when the testimony of McCain is corroborated by D. F. Bufkin, who was employed as a night service man, at a service station in Breckenridge located approximately 2 miles west of the Reed Oil Station. Bufkin identified the three men and the 1959 Oldsmobile and testified that he sold them gas at that time.

Ethel Smith, a night waitress at the Maridee Coffee Shop in Breckenridge, Texas corroborated McCain's testimony when she identified appellant, McCain and Wilhelm as customers upon whom she waited on July 4, 1966, between the hours of 2 and 3 a. m. She had waited upon all of them before and she testified that on the occasion in question appellant started a disturbance when she asked the three men to move out of the dining room into the coffee shop area for service.

Kenneth Brady, a delivery man for an Abilene newspaper, testified that he knew the deceased, Clarence Swaim, and that at approximately 2:30 a. m., July 4, 1966, he had occasion to stop at the Reed Oil Station; that he stayed there about 10 minutes and that at such time the deceased was in good health.

Jack W. Pruett, a building contractor in Abilene, testified that he found the station in question unattended after he drove in and that he then awakened the owner of the station who lived nearby. He estimated his arrival in Breckenridge somewhere near 2:30 a. m. on July 4, 1966. Numerous wit-

nesses testified that the cash register of the Reed Oil Station was discovered open and that the station was found unattended at approximately 3 a. m., July 4, 1966. The owner of the station testified that approximately $271.05 was missing.

C. A. Hanson, owner of a service station located approximately 3 miles south of Hamilton, Texas, identified appellant and his companions as being in his service station some time between 6 and 6:30 a. m., July 4, 1966. He further identified the 1959 Oldsmobile as the automobile in which they were riding.

The desk clerks at the Travis and Maria Motels in San Antonio both identified the appellant, McCain, Wilhelm and the automobile in which they were traveling.

Ballistic evidence proved that the .38 caliber revolver and the .380 automatic pistol recovered by the San Antonio police officers aided by McCain were the murder weapons. Irby Wilhelm and Eva Bradford identified the .38 caliber revolver as the one shown to them by McCain in the presence of appellant and Ronnie Wilhelm. The .380 caliber automatic pistol was identified by the deceased's wife as the pistol he always carried to work with him.

Lawrence Weigold, a clerk at a pawn shop in San Antonio, Texas, identified the .380 automatic pistol as the one appellant and his two companions attempted to trade on a newer model. He testified that three men talked among themselves and shopped around for thirty or forty-five minutes. He related that no trade was made. On cross-examination he testified that it was not appellant who had personal possession of the pistol at the time but that it was the accomplice witness McCain.

Appellant did not testify or offer any evidence in his behalf.

The court charged the jury on the law of principals and the law of circumstantial evidence. The court further, in its charge, instructed the jury that the witness McCain was an accomplice witness as a matter of law and fully instructed them as to the corroboration necessary to convict under the provisions of Article 38.14, Vernon's Ann. C.C.P., which reads:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows a commission of the offense."

█ The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise, it is not. Dalrymple v. State, Tex.Cr.App., 366 S.W.2d 576; Bradford v. State, 170 Tex.Cr.R. 530, 342 S.W.2d 319.

In Minor v. State, 108 Tex.Cr.R. 1, 299 S.W. 422, this Court said:

"The law forbidding a conviction upon the uncorroborated testimony of an accomplice does not demand that there be direct evidence pointing to the accused as the offender, but merely requires that there be 'other evidence tending to connect the defendant with offense committed.' * * * Circumstances proved by credible witnesses may be as potent as direct testimony in tending to connect the accused with the commission of the offense. The state is not called upon to point to some single or isolated fact which in itself, unrelated to other proven facts, will be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supply the test. If by this rule it appears on appeal that before the jury there was proof confirming the testimony of the accomplice to material facts tending to connect the accused with the commission of the offense,

the law is satisfied." (Collating numerous Texas cases) See also Morgan v. State, 171 Tex.Cr.R. 187, 346 S.W.2d 116; Barnett v. State, 163 Tex.Cr.R. 270, 290 S.W.2d 234.

In Cawley v. State, Tex.Cr.App., 310 S.W.2d 340, this Court quoted with approval portions of 22 C.J.S. Criminal Law § 812, pp. 1404 and 1405 (revised as 23 C.J.S. Criminal Law § 812(4)f., p. 118) regarding the law of corroboration of accomplice witnesses. That quotation more fully reads as follows:

"(P)roof that accused was at or *near the scene of the crime at or about the time of its commission* is admissible in corroboration of the testimony of the accomplice, and may tend to connect accused with the commission of the crime, so as to furnish sufficient corroboration to support a conviction when coupled with *suspicious circumstances,* such as *unseasonableness of the hour, without reasonable explanation therefor, * * * lack of apparent reason for such presence, * * * being in the company of the accomplice, * * * subsequent flight, * * *."* (Emphasis Supplied)

Further, 23 C.J.S. Criminal Law § 812(4) h., p. 120, states:

"(T)he possession by accused of the fruits of the crime, such as property stolen at the time of the burglary, robbery, larceny, or murder, of itself generally tends to connect him with the commission of the crime, and may be sufficient corroboration of the testimony of an accomplice to warrant a conviction * * *." (Citing a multitude of Texas cases)

■ The corroborating testimony clearly places appellant in the presence of the accomplice near the scene of the crime at or about the time of its commission in the early morning hours of July 4, 1966, without any reasonable explanation therefor. Appellant's immediate journey to Hamilton and then on to San Antonio may reasonably be considered as flight. Further, appellant,

along with the accomplice witness and other companion, were witnessed in the possession of the .380 caliber automatic pistol belonging to the murder victim in the pawn shop the day after the commission of the crime.

We hold that the evidence amply corroborates the accomplice witness's testimony and is sufficient to sustain the jury's conclusion of appellant's guilt.

Thomas v. State, 166 Tex.Cr.R. 331, 313 S.W.2d 311, relied upon by appellant is distinguishable from the case at bar. In Thomas there was no evidence of flight nor was Thomas seen in company of the accomplice witness subsequent to the offense in possession of an item clearly identified as taken during the robbery-murder.

Appellant asserts that there is no evidence to corroborate McCain as to malice, placing of the murder weapon in appellant's hands, or placing appellant at the actual scene of the crime.

In White v. State, 129 Tex.Cr.R. 59, 84 S.W.2d 465, this Court said:

"It is well settled that the state need not corroborate its accomplice witness upon *all* of his testimony, indeed, the requirement of the law goes no further than to demand that there be testimony other than that of the accomplice which in and of itself tends to connect the accused with the crime alleged." (Emphasis Supplied)

See also Sheffield v. State, 165 Tex.Cr.R. 354, 307 S.W.2d 100; Cert. den. 375 U.S. 833, 84 S.Ct. 45, 11 L.Ed.2d 63.

Appellant's first four grounds of error are overruled.

■ Next, appellant complains of the State's failure to establish venue in Stephens County, Texas. The undisputed evidence showed that the Reed Oil Station and the field 4 or 5 miles away where the body of the deceased was found were in Stephens County. All the witnesses who

testified as to events surrounding the killing and the discovery of the body related that they occurred at or near Breckenridge, Texas, and we can take judicial notice that Breckenridge is in Stephens County. See Carpenter v. State, 169 Tex.Cr. R. 283, 333 S.W.2d 391.

■ It is well settled that venue may be proved by circumstantial evidence as well as positive evidence, and that the prosecution is not required to prove venue beyond a reasonable doubt. "It is sufficient if the jury may reasonably conclude from it that the offense was committed in the county alleged." 16 Tex.Juris.2d, Criminal Law, Sec. 230, pp. 383, 384; See also Curtis v. State, 167 Tex.Cr.R. 536, 321 S.W.2d 587; Hatfield v. State, Tex.Cr.App., 377 S.W. 2d 647.

Ground of error #5 is overruled.

■ Lastly, appellant urges that jury misconduct resulted when they considered an aspect of parole in their deliberations on punishment.

The transcription of the court reporter's notes on appellant's motion for new trial reflects that the jury, during their deliberations at the one stage trial, promptly concluded that appellant was guilty of the offense charged. Immediately thereafter a vote was taken regarding punishment, the results being divided: five in favor of death, five in favor of 99 years or life, and two in favor of a term of years less than 99. A discussion ensued as to the difference between a 99-year sentence and life imprisonment and parole, and a lady juror stated that she thought that a 99-year sentence was stronger than a life sentence. Two jurors were permitted to testify that in their opinions the discussion influenced the final verdict. However, both jurors testified that the discussion was not lengthy, and that no one really understood the difference between sentences of 99 years and life or the parole law.

From the jurors' testimony it appears that, while they did discuss the matters of parole and the difference between sentences of 99 years and life, no one professed to know the law, or made a misstatement of the same.

This ground of error was recently before this Court upon similar facts in Johnson v. State, Tex.Cr.App., 418 S.W.2d 834, and was decided adversely to appellant's contention.

See also Taylor v. State, Tex.Cr.App., 420 S.W.2d 601, where this Court said:

"It is a matter of common knowledge that from time to time inmates of the Texas Department of Corrections are released on parole, Torres v. State, 169 Tex.Cr.R. 113, 331 S.W.2d 929; Walker v. State, Tex.Cr.App., 201 S.W.2d 823, and it is not every mention of parole which calls for a reversal. Henderson v. State, 169 Tex.Cr.R. 206, 332 S.W.2d 705; De La Rosa v. State, 167 Tex.Cr. App. 28, 317 S.W.2d 544."

The trial court did not abuse its discretion in refusing to grant the motion for new trial on the above grounds.

The judgment is affirmed.

### OPINION ON APPELLANT'S MOTION FOR REHEARING

BELCHER, Judge.

The appellant re-urges his ground of error that the state failed to establish venue in Stephens County, Texas.

A re-examination of the record reveals the following:

Tom Sullivan testified that about 8 a. m., July 4, 1966, while he was traveling along a road southeast of Breckenridge he saw a man lying out in a field, and he immediately reported it to the owner of the land.

Deputy Sheriff Ragland of Stephens County testified in part as follows:

"Q * * * Who owned the land where the body was found?

"The Witness: A Doc Ritchey.

"Q You know this of your personal knowledge?

"A It's on the Tax Roll that way, yes, sir."

Mrs. Christine Ritchey testified that she and her husband owned and lived on a farm about six miles from Breckenridge; and that she called Sheriff Booth after Tom Sullivan came to her house about 9 a. m.

Sheriff Booth, of Stephens County, after testifying that about 9 a. m., July 4, he went to the "Ritchey place," further testified as follows:

"Q What did you find?

"A I found Clarence Swaim (deceased) out in the field, off to the right of the road.

"Q When you got there at the scene, who was there, do you recall?

"A I don't believe there was anyone there when I arrived. There had been, and shortly after that, there was several people came up.

"Q You don't recall whether or not Doc Ritchey and Tom Sullivan were there when you arrived?

"A (No audible answer)

"Q At the body?

"A If they wasn't, they were there shortly thereafter.

"Q They were around there close, they got there about the same time?

"A Yes.

"Q Now, then, what did you do when you got there to the scene where the body was?

"A I called on the radio for an ambulance and for a coroner.

"Q All right, sir. And, then, what did you do?

"A Waited for the ambulance and the coroner.

"Q All right. Did you aproach the body and disarrange the body at that time?

"A No, I didn't disarrange it. I just approached the body.

"Q Did you touch the body before the coroner got there?

"A No.

"Q How long was it before the coroner got there?

"A Oh, I imagine it was 30 minutes, maybe longer.

"Q Was the ambulance coming along pretty quick?

"A About the same time, yes, sir.

"Q * * * Was the coroner Cecil Mayes?

"A Yes, Cecil Mayes.

"Q What is his capacity in Stephens County?

"A County Judge.

 *   *   *   *   *   *

"Q You arrived at the scene where the body was, on July 4, 1966, in Stephens County, Texas, at approximately what time, if you recall?

"A Well, I don't remember the time exactly, but it was sometime around

8:30, to a quarter to nine, somewhere about that time."

Art. 13.10, Vernon's Ann.C.C.P. (1965), authorizes a prosecution in the county "where the dead body is found."

In considering the construction to be applied to the above quoted phrase which was added by amendment in 1935, this court in McCaine v. State, Tex.Cr.App., 211 S.W. 2d 190, said:

"As contended by the State, the reason for such addition is given in the emergency clause, suggesting that the old article above quoted was not sufficiently broad and definite so that the Legislature thought it best to add a further clause relative to the venue in murder cases. The contention of appellant that such added clause can only be applied in the event that the injury herein took place in Harris County, the death therefrom occurring in Jefferson County and the body be found in a further county, is not sound. Evidently the last amendment was intended to and did fix the venue of any homicide, either in the county where the injury occurred, where the death therefrom occurred, or where the dead body was found, and added a third place of venue to an already existing statute, * * *." See also: 29 Tex.Jur.2d 161, Sec. 135; Gunn v. State, 170 Tex.Cr.R. 288, 340 S.W.2d 496.

■ Venue being a jurisdictional fact, not an element of the offense, it need not be established by evidence beyond a reasonable doubt, and may be proved by circumstantial as well as direct evidence. 24 Tex. Jur.2d 418, Sec. 740; 1 Branch 2d 464, Sec. 471.

■ The facts and circumstances in evidence are sufficient to authorize the conclusion that the dead body of the deceased was found in Stephens County, Texas.

The motion for rehearing is overruled.