Danziger v. State 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN



 




NO. 3-90-086-CR





RICHARD DANZIGER,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE


 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT


NO. 96,470, HONORABLE BOB PERKINS, JUDGE



 





PER CURIAM


 A jury found appellant guilty of aggravated sexual assault and assessed punishment at
imprisonment for life. Tex. Pen. Code Ann. § 22.021 (1989). The offense occurred on the
morning of October 24, 1988, when Nancy DePriest, working alone at the Reinli Street Pizza Hut
in Austin, was robbed, sexually assaulted, and murdered. Christopher Ochoa pleaded guilty to
the murder of DePriest pursuant to a plea bargain entered with the State. Ochoa then testified for
the State in this case as an accomplice witness. Appellant's sole contention on appeal is that the
evidence is insufficient to corroborate Ochoa's testimony. Tex. Code Cr. P. Ann. art. 38.14
(1979). 

 Ochoa testified that in October 1988, he, his brother Ralph, Roger Lewis, and appellant
lived together in an apartment in Austin. Ochoa worked as a cook for the Pizza Hut on Guadalupe
Street, and appellant worked for the Pizza Hut on North Lamar. On the evening of Sunday,
October 23, 1988, appellant and Ochoa bought some beer and took it to Donna Angstadt's house. 
When they arrived, around 10 p.m., Angstadt was in the kitchen ironing. While she remained
in the kitchen, Ochoa and appellant sat in another room drinking and playing cards. Appellant
told Ochoa that he needed some money and thought he could get it by robbing the Pizza Hut on
Reinli Street. At first, Ochoa wanted nothing to do with it, but appellant urged Ochoa to help him
out, and Ochoa finally gave in. Appellant said that he was planning the robbery for that evening;
he said that he would arrange an alibi by asking their roommate Roger Lewis to come over and
by having Ochoa go home with him while appellant spent the night at Angstadt's house.

 Lewis did come over, and about 5 a.m. he and Ochoa each drove his own car home. 
Ochoa slept 1½ hours and at 7 a.m. went to a McDonald's restaurant where he and appellant had
arranged to meet to finalize the plans for robbing the Reinli Pizza Hut. Shortly after Ochoa got
there, appellant arrived, driving Angstadt's car. Appellant decided that Ochoa would be the
lookout, and he showed Ochoa a gun inside his pants.

 The two drove to an apartment complex across the street from the Reinli Pizza Hut,
parked their cars at about 7:30 a.m., and watched as Nancy DePriest arrived in a car, talked to
someone who had driven up with her on a motorcycle, and then went inside the Pizza Hut. Ochoa
and appellant walked across the street and appellant used a key to open one of the restaurant
doors. When they walked in, DePriest was preparing dough. She recognized Ochoa and asked,
"What's up, Chris?" 

 Appellant told DePriest to shut up and give him all the money; he showed her the gun
in his hand. DePriest and appellant went back to the safe, and appellant returned with a white
coin bag and some vinyl bank bags. Appellant said, "Well, we're going to have a little fun now,"
as he pushed DePriest down on her knees and had oral intercourse with her, holding the gun on
her head. Then appellant brought DePriest to another spot and removed her clothes; he told
Ochoa to get an apron and spread it on the floor. Appellant told Ochoa to tie DePriest's hands
behind her back with her bra, after which he pushed DePriest down on her back on top of the
apron and had vaginal intercourse with her. Appellant was pointing the gun at DePriest, and
Ochoa was resting his knees on her shoulders; DePriest was kicking, but appellant told her to stop
moving or he would "blow her away."

 When appellant told Ochoa that it was his turn to "have fun" with DePriest, Ochoa had
vaginal intercourse with her. DePriest was asking them to stop, and one or both men put a scarf
in her mouth and tied her legs with her blouse. The two next dragged DePriest to a booth and
put her on the table, where appellant untied her legs and each man had vaginal and anal
intercourse with her. Appellant and Ochoa decided that they would have to kill DePriest because
she had recognized Ochoa. They took her to the hallway where the bathrooms were, and
appellant made DePriest kneel. Appellant told Ochoa, "You kill her," and handed him the gun. 
Ochoa held DePriest's shoulders with his right hand and pulled the trigger with his left, shooting
her in the back of the head.

 Appellant and Ochoa then dragged DePriest to the women's restroom, where appellant
had vaginal and oral intercourse with her, and Ochoa had vaginal intercourse with her. Ochoa
wiped the surfaces in the restaurant that they had touched and helped appellant wash DePriest's
body. Appellant wiped the restroom, stuffed aprons in the sink around the stopper, and left the
water running; the two dragged DePriest outside the bathroom and left her lying there. Ochoa
got the money bag and gave it to appellant, and they left in separate cars.

 On the evening of November 9, 1988, appellant and Ochoa were drinking wine at
Angstadt's house. Appellant mentioned that he had taken some checks to the Reinli Pizza Hut that
day and asked if Ochoa wanted to go there. Ochoa declined and asked to go home; however, after
they got in the car, appellant drove to the Pizza Hut anyway. They went in, sat down in a booth,
and ordered two beers. A security guard and manager were there. Appellant and Ochoa talked
some, but Ochoa did not feel like drinking his beer and they left. The security guard was waiting
outside. Appellant started talking to him, asking if they had any evidence or leads yet. Appellant
told the guard that he worked at the North Lamar Pizza Hut and asked if the gun could have been
a .22. After they talked to the guard awhile, appellant took Ochoa home.

 Appellant testified in his own behalf and denied that he sexually assaulted DePriest. 
Appellant claimed that on the morning of October 24, 1988, he was not at the Reinli Pizza Hut,
but he was sleeping at Angstadt's house. 

 To test the sufficiency of the corroboration, we must eliminate the evidence of the
accomplice witness to ascertain if there is other incriminating evidence which tends to connect
appellant with the commission of the offense. Edwards v. State, 427 S.W.2d 629 (Tex. Cr. App.
1968). It is not necessary that the corroboration directly link the accused to the crime or be
sufficient in itself to establish guilt. Reed v. State, 744 S.W.2d 112,126 (Tex. Cr. App. 1988). 
The combined cumulative weight of the incriminating evidence furnished by the non-accomplice
witnesses supplies the test. Id.

 Donna Angstadt testified for the State and stated that in October 1988 she worked as
the general manager of the North Lamar Pizza Hut. She first met appellant there in September
1988, and the two of them became romantically involved. By the end of October, appellant spent
three or four nights a week at her house. Angstadt described the events of Sunday evening
October 23, in which appellant and Ochoa came over, and drank beer and talked while she ironed
in the kitchen. During the 15 or 20 minutes that she was ironing, she did not know what they said
or did. Around 11 p.m., a girlfriend of hers arrived and the four of them played a drinking game. 
At some point, appellant left to drive Ochoa home, but they returned, saying that they had broken
Ochoa's car key. They called Ochoa's roommate, Roger Lewis, at about 2 a.m. Angstadt did
not remember how long Lewis stayed because she was pretty drunk, but she thought that he
eventually left with Ochoa. Appellant stayed over at her house.

 The next thing she remembered was being awakened by the telephone's ringing in the
morning. Appellant answered the phone. Appellant was supposed to be at the North Lamar Pizza
Hut at 8 o'clock that morning, and Billy Brown, Angstadt's supervisor, was calling to find out
why the store was not open. Angstadt thought that Brown had called about 9:15 a.m.

 Angstadt was responsible for making sure that her restaurant was open on time, and she
hurried to get her two children and herself ready to leave the house. When Angstadt got in her
car, she had to pull the front seat up, which she testified was unusual because she had not driven
the car since the previous Saturday night. It was not possible that she had left the seat in the back
position. Angstadt stated that appellant did not have a copy of her car key, that she always kept
her car keys on a hook by the kitchen cabinet, and that her keys were on the hook that morning. 
They did not arrive at the restaurant until after 10 a.m.

 Angstadt testified that sometime between October 24 and November 11, 1988, appellant
said to her, "I was with you, right?" She thought that appellant asked this one or two days after
the incident. Angstadt stated that when she drinks, she is a very heavy sleeper, and that appellant
could easily have left the house the morning of October 24 without her knowing it. 

 Police Sgt. Boardman testified that on November 11, 1988, he went to Angstadt's house
to talk to appellant. Appellant was sitting on the couch inside, and Boardman asked if appellant
would mind stepping outside with him. Once outside, Boardman explained that they were
investigating DePriest's murder and they needed to talk to him at the police station. Appellant
said he had been waiting for them to come see him and wondered why it had taken so long for
them to get to him. Boardman responded, and appellant immediately turned around, pointed at
Angstadt, and said, "That's my alibi."

 At the police station, Sgts. Boardman and Polanco interviewed appellant. When
Boardman asked appellant what he knew about the murder, appellant told him that DePriest had
been shot in the back of the head with a .22 caliber weapon, that the floor of the restaurant had
been flooded, and that the flooding was caused by a blue apron which had been placed in the sink
to stop up the overflow of the sink. Boardman asked appellant how he learned this, and appellant
answered that he had learned it from the security guard at the Reinli Pizza Hut. Boardman had
already talked to the guard, and he told appellant that the guard did not know that. Appellant
immediately said that he must have heard it from Billy Brown, Donna's boss. When appellant
said this, Boardman left the room to call Brown.

 When Boardman returned, he told appellant that no one could possibly have known that
information without being at the scene during the commission of the crime. Boardman did not
recall appellant's saying that he learned the information from anyone else. Sgt. Polanco testified
that he, too, was present when appellant said that DePriest was shot with a .22 caliber handgun
and that a blue apron placed in the sink had caused the flooding.

 Sgt. Balagia also interviewed appellant at the police station on the night of November
11, 1988. Balagia asked appellant what he could tell him about the murder at Pizza Hut, and the
first thing appellant said was that he had an alibi. Appellant explained that his alibi was Angstadt
and that he spent the night before the murder with her, overslept that morning at her house, and
was late to work at the North Lamar Pizza Hut. He did not wake up until Billy Brown
telephoned. Appellant then stated, "You don't have any evidence that would link me to the
crime." Balagia answered that that reaction was unusual for someone accused of a crime such as
capital murder. Appellant responded, "You're not going to pin a capital murder on me." Balagia
next asked appellant specifically what he knew about the crime scene, and appellant mentioned
that the victim was shot in the back of the head with a .22 caliber handgun and that the floor of
the Pizza Hut was flooded because the suspect placed a blue work apron in the sink. Appellant
was extremely confident that the police could not make a case on him.

 Sgts. Boardman, Polanco, and Balagia testified that details about the crime such as the
use of a .22 caliber weapon and a blue apron had not been released to anyone outside the police
department.

 Lorenzo Phelps testified that in November 1988 he was employed as a private security
officer at the Reinli Pizza Hut. During his employment there, he knew that a small-caliber
weapon was used in the murder and that water faucets left running had caused the restaurant to
flood. The first time he learned both that a .22-caliber weapon had been used and that a blue
apron had plugged up the sink was the morning he testified. Phelps stated that he told nobody
either of those facts and that he could not have told them to appellant because he did not know
them. 

 Phelps also testified to having a discussion with appellant and Ochoa in the Reinli Pizza
Hut parking lot on November 9, 1988. Appellant asked him when the restaurant started having
security and whether they had any suspects or any evidence. Appellant also stated that he had
heard that DePriest was found by the register. Appellant's questions seemed unusual and Phelps
asked appellant where he was at the time of the offense. Appellant said that he was at work
opening the Pizza Hut on North Lamar. During the conversation, Phelps may have stated that a
low-caliber weapon was used, but that was as much as he knew. Appellant told Phelps that he
thought two people had done it.

 Billy Brown testified that he worked as an area lead manager for Pizza Hut restaurants
on October 24, 1988. On that morning, he was awakened by a call from his supervisor, who told
him that the restaurant on North Lamar was not open. After finally reaching appellant at
Angstadt's house, Brown went straight to the North Lamar Pizza Hut; appellant and Angstadt
arrived about one-half hour later. Brown estimated that he was awakened at 9 o'clock that
morning. 

 Around noon, Brown went to the Reinli Pizza Hut to see what was going on, and he
later made phone calls to find out what had happened. Brown stated that between October 24 and
November 11, he never learned the kind of weapon used to kill DePriest or that a blue apron had
been stuffed in the sink of the women's restroom to flood the restaurant; to the date of trial, he
did not know the caliber weapon used. On November 11, Sgt. Boardman called to ask him the
caliber of the gun and some of the information about the crime scene; Brown told him what he
knew at the time.

 The State called a number of witnesses who were involved with the crime scene,
including employees of the police department, emergency medical service personnel, and workers
at Pizza Hut. All testified that they did not release the facts of the specific caliber weapon or the
blue apron to appellant, Ochoa, or anyone beyond medical personnel, the police department, or
the prosecutor's office.

 Juan Rojas testified that he performed hair analysis as an employee in the criminalistics
section of the Department of Public Safety laboratory. He compared hairs found at the Reinli
Pizza Hut with the known head and pubic hairs of four persons: appellant, Ochoa, Nancy
DePriest, and Nancy's husband, Todd DePriest. One hair found in the arcade area was consistent
with appellant's known pubic hair, and this hair was different from the head and pubic hairs of
the other three. The strength of Rojas' comparison was weakened by the fact that this hair was
missing its root. Although hair comparisons do not constitute a basis for absolute personal
identification, Rojas concluded that the hair found at the Pizza Hut could have come from
appellant.

 The State also introduced the testimony of Edward Gilbert, a corrections officer with
the Travis County Sheriff's Department. In April 1989, Gilbert was assigned to the Travis
County Jail, where both appellant and Ochoa were being held. One of Gilbert's responsibilities
was to serve dinner to the inmates, and on April 25, Ochoa helped him serve. Ochoa's job was
to hand trays one at a time to the men as they came through a line. After appellant got his tray
and a drink, he stated, "That's the mother-fucker that squealed on me," and threw his drink in
Ochoa's face. Gilbert immediately got between appellant and Ochoa, but appellant tried to climb
over Gilbert to get to Ochoa. Gilbert pushed appellant back, called for help, and told Ochoa to
go to another room. Gilbert wrote appellant's words verbatim in a report, and he had no doubt
as to appellant's exact words.

 The evidence adduced by the State corroborates that of Ochoa in several ways. The
evidence establishes the falsity of appellant's explanation for knowing that a .22-caliber weapon
was used to kill DePriest and that a blue apron was put in the sink to flood the restaurant. Under
the evidence, the only reasonable explanation is that appellant was present during the commission
of the offense. A hair consistent with appellant's pubic hair was found at the scene. Appellant
accused Ochoa of squealing, or informing, on him. Details such as Angstadt's car seat being
back, appellant's asking Sgt. Boardman why he took so long to get to him, appellant's pointing
to Angstadt as his alibi, and appellant's confirming with Angstadt that he had been with her on
October 24 also are corroborative. We find the non-accomplice evidence sufficient to connect
appellant to the offense and therefore sufficient to corroborate Ochoa's testimony.

 The judgment of conviction is affirmed.



[Before Chief Justice Carroll, Justices Jones and B. A. Smith]

Affirmed

Filed:  August 30, 1991

[Do Not Publish]