TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-95-00474-CR






Rashid Muhammad, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT


NO. 18,896, HONORABLE CHARLES LANCE, JUDGE PRESIDING






 The State prosecuted Timothy Winters, Rashid Muhammad, Trayvonce W. Wright,
and Kenneth Smith for the murder of Wilbert Miller on or about July 27, 1994. (1) The trial court
instructed the jury to acquit Smith. The jury convicted the remaining defendants and sentenced
Muhammad to forty years in prison and a $10,000 fine. By his sole point of error, Muhammad
contends the trial court erred by denying his request for a directed verdict because insufficient
evidence corroborated the accomplice witness's testimony. We will affirm the judgment of
conviction.

 The only eyewitness account of the murder came from Chris Evans, a participant. 
Evans testified that Muhammad told him that Miller owed Muhammad $500. Evans said that on
an evening in summer 1994, he, the four defendants, and Miller left Kathy Pride's house in a
green Buick LeSabre. They stopped near a softball field, got out of the car, and started walking. 
Evans said the defendants started talking about harming Miller; Smith argued that they should just
beat him, but the other three wanted to kill him. The latter view prevailed, as Winters grabbed
and held Miller so that Muhammad and Wright could stab him. Winters next took a knife and
stabbed Miller, then Evans took the knife and stabbed Miller. The five left Miller to die.

 Several months later, Evans reported finding a skeleton to police. Investigators
eventually identified the skeleton as Miller's remains. Evans initially denied knowing who the
skeleton was. Over the course of several interrogations, his story evolved, increasing his
culpability, until he admitted to delivering the final, fatal stab wound to Miller. He agreed to a
thirty-year prison term for his role in the murder.

 Muhammad's challenge to the denial of the motion for directed verdict is a
challenge to the legal sufficiency of the evidence to support the verdict. See Madden v. State, 799
S.W.2d 683, 686 (Tex. Crim. App. 1990). We must review all the evidence in the light most
favorable to the verdict and decide whether any rational trier of fact could have found beyond a
reasonable doubt all elements of the offense. Jackson v. Virginia, 443 U.S. 307, 319, (1979);
Santellan v. State, 939 S.W.2d 155, 160 (Tex. Crim. App. 1997). We measure the sufficiency
of the evidence against the charge given. Gonzales v. State, 931 S.W.2d 574, 575 (Tex. Crim.
App. 1996). The charge instructed the jury to convict the appellants of murder if it found beyond
a reasonable doubt: (a) that appellants intentionally or knowingly caused Miller's death by
stabbing him in the chest and abdomen with a knife; (b) that appellants, intending to cause serious
bodily injury to Miller, committed an act clearly dangerous to human life by stabbing him in the
chest and abdomen, thereby causing his death; or (c) that any of the appellants knowingly caused
Miller's death by stabbing him and that any of the other appellants knew of the intent to kill and
acted with intent to promote or assist the murderer or murderers in the commission of the offense
by encouraging, directing, aiding, or attempting to aid the commission of the murder. The charge
also instructed that, because Evans was an accomplice to the murder, his testimony could not
support appellants' conviction unless it was corroborated by other evidence tending to connect the
appellants with the offense committed; the evidence must show more than mere commission of
the offense. See Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979). 

 When reviewing the sufficiency of the corroboration, we must ignore the
accomplice witness's testimony and decide whether other non-accomplice evidence tends to
connect the accused with commission of the crime. Walker v. State, 615 S.W.2d 728, 731-32
(Tex. Crim. App. 1981). We view the corroborating evidence in the light most favorable to the
verdict. Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); Utsey v. State, 921 S.W.2d
451, 453 (Tex. App.--Texarkana 1996, pet. ref'd). The accomplice witness's testimony need not
be entirely corroborated, nor need the corroboration directly link the accused to the crime or be
sufficient in itself to establish guilt. Gill, 873 S.W.2d at 48. Evidence that corroborates what the
accomplice said he and others did but that does not connect the others to the crime cannot be
considered. Walker, 615 S.W.2d at 732 (finding murder weapon where accomplice said they
threw it does not connect other defendants to crime). Evidence that merely shows the commission
of the offense and the joint presence of the accomplice and accused shortly before or after the
offense does not provide sufficient corroboration. Lyman v. State, 540 S.W.2d 711, 714 (Tex.
Crim. App. 1976). Additional evidence can make that evidence sufficient corroboration,
however. Edwards v. State, 427 S.W.2d 629, 633 (Tex. Crim. App. 1968) (otherwise
unexplained presence, shortly after crime, with accomplice in early morning hours in small town
near crime scene, immediate journey to city hundreds of miles south, and pawning of victim's
pistol after crime provided sufficient corroboration).

 Peace officers and scientists testified regarding the discovery of and tests on
Miller's skeletal remains, recovered near a softball field just outside of Rockdale. Their 
testimony showed that Miller had been stabbed multiple times in the chest and abdomen, probably
by two knives. No physical evidence linked appellants to the victim.

 Some of Miller's friends and family testified that he sold drugs. A cousin found
crack and powder cocaine in his room. An uncle testified that he flushed the powder down the
toilet; the uncle testified he knew of no connection between the drug sales and the appellants. 
Other witnesses testified that they never saw Miller sell drugs.

 Virgil Crawford testified that he sold drugs with Smith and the appellants. 
Crawford said he had last seen the victim with the appellants at Kathy Pride's house and that
Muhammad said that he was going to "fuck [Miller] up if he didn't have the money" for some
drugs that had been advanced to him. Crawford said he left the house because he felt something
bad was going to happen. He never saw Miller alive again.

 Pride testified she had seen the appellants with Crawford at her house, but never
all at once. She recalled appellants and the victim being at her house together. She testified that,
if Miller had "crossed" the appellants, she believed they would harm him. She also testified,
however, that the appellants and the victim were on friendly terms the last time she saw them. 
She knew of no connection between the appellants and the murder.

 April Knight, Pride's niece, gave confusing and contradictory statements and
testimony. She gave two written statements to police, the second of which was admitted at trial. 
She testified before the grand jury and at the trial.

 In the admitted statement, Knight said that in the late summer of 1994, the
appellants, Smith, the victim, and Evans left her aunt's house after dark in Wright's green car. 
Knight never saw Miller again. After an hour, the appellants and Smith returned. The appellants
remained outside talking about killing someone, but acted like they did not want her to hear. 
Smith appeared upset and in shock. Miller was selling drugs for Muhammad and Wright, but
"got crossways" with them over some dope, probably by not paying them for some dope that they
had fronted him. Sometime later, Smith told her he was present when Miller was murdered. He
did not tell her who did the killing, but said he tried to dissuade them and just watched.

 At trial, Knight testified that the four defendants sold drugs at Pride's house. She
first testified that she never saw Miller, her cousin, sell drugs; when directed to read her second
statement to police, she recalled seeing Miller sell drugs for Wright. She testified that she knew
of no problem between Miller and the defendants; when directed to read her second statement,
she acknowledged that she had said that there was a problem, but recanted that assertion. She
nevertheless maintained that Miller owed the appellants money for drugs. She then stated that
Miller had sold drugs for four or five years before the appellants ever came to Rockdale, while
admitting that she had only minutes before denied ever seeing him sell drugs. She said that, on
the night Miller disappeared, all four defendants were at the house where she lived with her aunt,
Kathy Pride; she said Miller showed up briefly and left alone, though she had said in her second
statement that he left with the defendants. She said she was scared when she gave the second
statement and simply went along with what the officers told her had occurred. She denied that
Smith told her he was present when Miller was killed, while acknowledging that she had testified
before the grand jury he had done so. 

 After being admonished on the penalties for perjury, Knight conformed her
testimony about who she saw getting into the car on the night of the murder to the version in her
statement; she said the defendants, the victim, and Evans got into the car, but that only the
defendants returned. She again denied that Smith told her about the stabbing but, when
confronted with her statement to police that he had, she admitted that he had told her about the
stabbing. (The court limited that statement to use against Smith.) After giving contrary testimony
on whether he told her he was present when Miller was stabbed, she stated that her testimony that
he had not told her he was present was false.

 On cross examination, Knight said the police threatened to take her baby away from
her if she did not tell the truth in her statements to them; she said she therefore told the police
what they wanted to hear. She denied telling Virgil Crawford that the appellants killed Miller;
she said Crawford might lie. She said she never saw Miller afraid of appellants. She denied
being told or knowing who killed Miller. When asked what the truth was, she said she did not
know. Knight then reasserted her original statement to police that the last time she saw Miller he
was walking alone, and said that in her second statement she only went along with the "official
version" that he got into the car with the appellants. She said she never saw the defendants sell
powdered cocaine; if Miller had some, it was not from them. She said that the defendants were
not in Wright's green car but in a rented car the last time they were in Rockdale. She said that
the second statement was the police's words, not hers; she said the second statement was the truth,
but that she merely went by what they told her, not what she knew.

 On redirect examination, Knight said the second statement was not the truth, that
she never saw the defendants and Miller get into the car, and that Smith told her nothing. She
admitted that some of her grand jury testimony was false. She said she could not remember when
she last saw Miller. Though she testified that the appellants did not come to Rockdale during June
or July, she admitted she was not in Rockdale then and would not know if they had. On recross
examination, however, she said she visited on weekends. She said that the police kept insisting
that she tell the truth, when the truth was that she did not know anything about the murder.

 At the close of her redirect examination, the State offered Knight's second
statement to police in evidence. It was admitted without objection or limitation. The instruction
in the jury charge, limiting the consideration of evidence "that was admitted solely against
Kenneth Smith" to use only against Kenneth Smith, does not limit the use of evidence admitted
without limitation. On request, the court limited a particular part of Knight's testimony about
what Smith told her, but that limitation did not apply to the typed second statement that was later
admitted without objection or limitation. (2) 

 Viewed most favorably to the verdict, the evidence is legally sufficient to support
the conviction. Evans's testimony is easily sufficient if corroborated. Crawford's testimony
suggests a motive and intent to kill by Muhammad that immediately precedes Miller's
disappearance. The destruction of the drugs by Miller's relatives further corroborates Evans's
testimony regarding the reason for the slaying. Knight's testimony and statement, viewed most
favorably to the verdict, show appellants with the victim shortly before the murder, their
motivation to kill him, their discussion of murder after their return without Miller, and Miller's
coincidental disappearance. Her relation of Smith's admissions is somewhat corroborative, but
not decisive because he did not tell her who did the killing; it does, however, place all appellants
at the murder scene. The corroboration allows us to consider Evans's testimony, which provides
legally sufficient evidence for every element in the murder charge.


 The trial court did not err by overruling the motion for directed verdict. We
overrule the sole point of error and affirm the judgment of conviction.



 
 

 Marilyn Aboussie, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: July 24, 1997

Do Not Publish

1. Winters and Wright appeal their respective convictions in Cause Nos. 03-95-00473-CR and
03-95-00475-CR also decided this date. We will refer to them and Muhammad collectively as
"appellants." The three appellants were tried together, and we refer to our other two opinions
for a full recitation of the facts and evidence. The term "defendants" includes the appellants and
Smith.
2. The exchange leading to the limiting instruction was as follows:

 Q. And even though in that statement you say that "Kenneth told me that he
was there with 'Rock,' 'T-Top,' 'Tray Man,' and Chris Evans, you're now
telling us he didn't say that? Can you answer that question?

 A. Yes. 

 Q. Did he tell you that or did he not tell you that?

 A. Yeah, he told me that.

 Q. He told you that?

 A. Yeah.

Defense counsel then raised his objection, which was overruled, and requested an instruction
limiting use of that statement to use against Smith, which was given. This exchange occurred long
before the State offered the statement itself into evidence.


PAN STYLE="font-family: CG Times Regular"> On redirect examination, Knight said the second statement was not the truth, that
she never saw the defendants and Miller get into the car, and that Smith told her nothing. She
admitted that some of her grand jury testimony was false. She said she could not remember when
she last saw Miller. Though she testified that the appellants did not come to Rockdale during June
or July, she admitted she was not in Rockdale then and would not know if they had. On recross
examination, however, she said she visited on weekends. She said that the police kept insisting
that she tell the truth, when the truth was that she did not know anything about the murder.

 At the close of her redirect examination, the State offered Knight's second
statement to police in evidence. It was admitted without objection or limitation. The instruction
in the jury charge, limiting the consideration of evidence "that was admitted solely against
Kenneth Smith" to use only against Kenneth Smith, does not limit the use of evidence admitted
without limitation. On request, the court limited a particular part of Knight's testimony about
what Smith told her, but that limitation did not apply to the typed second statement that was later
admitted without objection or limitation. (2) 

 Viewed most favorably to the verdict, the evidence is legally sufficient to support
the conviction. Evans's testimony is easily sufficient if corroborated. Crawford's testimony
suggests a motive and intent to kill by Muhammad that immediately precedes Miller's
disappearance. The destruction of the drugs by Miller's relatives further corrobor