COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

LUCIANO TORRES A/K/A
HINOJOS,              )

                                                                              )               No.  08-01-00498-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                
205th District Court

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )               
(TC# 20010D00554)

                                                                              )

 

 

O
P I N I O N

 

Luciano Torres appeals his conviction for murder.  Appellant was indicted with two counts of
murder.  The jury found Appellant guilty
of Count I (killing the victim by striking her with a rock), and Count II
(killing the victim by striking her with an unknown object) was dismissed.  The same jury assessed punishment at 99 years= imprisonment and the trial court then
sentenced Appellant in accordance with the jury=s
verdict and assessment.  On appeal,
Appellant raises seven issues for review in which he challenges jurisdiction,
the trial court=s refusal
to allow renewal of Appellant=s
motion for instructed verdict, the effective assistance of his trial counsel,
the legal and factual sufficiency of the evidence to support his conviction,
and the trial court=s refusal
to submit a requested instruction to the jury on circumstantial evidence.  We affirm.








SUMMARY
OF THE EVIDENCE

Appellant and
Maria Jovita Valles, the
deceased, were married in January 2000 and lived together in El Paso,
Texas.  After a couple of months, the
couple and their respective children from previous marriages moved to a house
in Chaparral, New Mexico.  A month or two
later, Ms. Valles and her children moved out of the
house to an apartment in El Paso.  Ms. Valles did not tell Appellant where she was living during
their separation.

On Thursday June
15, 2000, Appellant went to the Eldorado Lounge in
Northeast El Paso between 11 and 11:30 in the evening.  At the bar, Appellant was drinking and asked
to borrow another patron=s
cell phone.  Appellant called Ms. Valles and asked her to join him.  Shortly after, Ms. Valles
arrived at the Eldorado by taxicab and joined
Appellant in the bar.  The couple drank
and soon began arguing; however, they later stopped arguing and acted
affectionate and amorous towards each other. 
A witness at the bar saw the couple leave together around 1 a.m., on
June 16, 2000, holding hands and walking towards Appellant=s truck.  The witness later saw Appellant driving his
truck on Dyer Street about five to seven minutes later, but could not see
anyone else in the vehicle because it has tinted windows.








Maria Luisa Diaz,
a close friend of Ms. Valles, was babysitting Ms. Valles=
two children that night.  Ms. Diaz went
to Ms. Valles= apartment the next morning to return
her children, but Ms. Valles was not there.  Ms. Diaz thought this was unusual.  Ms. Diaz waited to hear from Ms. Valles for the whole day and by nighttime reported her
missing to the police.  A few days later,
Ms. Diaz and her mother took Ms. Valles= children to Chaparral around 12 or
12:30 p.m. to try to locate Ms. Valles.  When they arrived at Appellant=s house, Appellant=s son and some of Appellant=s workers, including one nicknamed AHomie@ were outside.  Appellant=s
son came up to Ms. Diaz=s
car and Ms. Diaz asked him to call his father. 
The son went inside to get Appellant, but
Appellant did not come out.  Ms. Diaz did
not see Appellant=s pickup
truck at the house.  Homie
did not speak to Ms. Diaz, but his gestures to Ms. Diaz suggested to her that
Appellant was inside his office, which was near the house.  Ms. Diaz kept Ms. Valles= children for almost two weeks before
they were sent to live with their biological father in California.

Dolores Hinojos, Appellant=s
ex-wife, testified that she received a call from Appellant early in the morning
on June 16, 2000 during which Appellant asked her to take care of his
boys.  When Ms. Hinojos
asked if something was wrong, Appellant stated that things were not going well
for him and sounded sad and depressed. 
Ann Marie Richardson, Appellant=s
probation officer, testified that she spoke with Appellant over the telephone
on June 19, 2000 and asked him if he had seen or heard from Ms. Valles, who by that time had been reported missing.  Appellant asked why she was inquiring and Ms.
Richardson told him that she had received a message that Ms. Valles had dropped her children off and had not picked them
up.  Appellant told her that he had not
seen or heard from Ms. Valles for a week and a
half.  Appellant spoke of Ms. Valles in the past tense, which made Ms. Richardson think
that he was referring to someone Ano
longer with us@ and Ms. Valles was gone. 
After speaking with Appellant, Ms. Richardson notified the police of
their conversation.








On June 16, 2000,
the El Paso Police Department received a call from the Chihuahua State Judicial
Police in Juarez, Mexico reporting that a silver Dodge extended cab pickup
truck had been found at a bus terminal. 
The truck had a New Mexico license plate on the rear bumper and a set of
Texas plates in the bed of the truck, which actually belonged to that
vehicle.  The El Paso police went
over to Juarez on June 20, 2000 to view the truck, which they later determined
was Appellant=s
truck.  Inside the truck, the officers
found paperwork with Appellant=s
name, related to his roofing business. 
Stains in the interior of the truck tested negative for the presence of
blood.  The Juarez police turned over the
following items to El Paso Police Department Officers Arturo Ruiz, Jr. and Tom
Monday: a pair of blue jeans size 33 x 32, socks, and a rock measuring ten
inches wide and two to three inches in height that was sharp or broken on one
end.  Testing revealed that the items
recovered were heavily stained with blood and contained dirt and hair.  The officers also observed that one of the
windows in the extended cab portion of the truck was broken.  The keys to Appellant=s
truck were later found in the vehicle of Ricky Baron, nicknamed Homie, a close friend and employee of Appellant.








On June 28, 2000,
a woman=s body
was pulled from a canal/river behind the La Hacienda Restaurant on West Paisano in El Paso. 
The body was later identified as Maria Jovita Valles, the victim. 
She was clothed in the same outfit and jewelry she was wearing the night
she disappeared.  Dr. Juan Contin, the medical examiner for El Paso County, examined
the body and performed the autopsy.  Dr. Contin testified that the body was quite decomposed, with
flesh missing on the head and on the tips of the hands and feet.  The only significant injury was a fracture in
the skull, which started on the left side and traveled through the base of the
skull to the other side.  The major
impact, however, was on the left side of the skull.  Dr. Contin
concluded that such an injury would result in a lot of bleeding.  Dr. Contin agreed
that the rock in evidence was capable of causing death or serious bodily
injury.  Based on the presence of the
fracture in the skull, Dr. Contin opined that the
victim died of a head injury and that the manner of death was homicidal.  Chad Hainley, a criminalist with the Texas Department of Public Safety
Crime Laboratory, testified that DNA analysis established that blood on the
jeans, socks, and the rock recovered from Appellant=s
truck was consistent with the DNA profile from the victim=s teeth.

At trial,
Appellant testified in his defense. 
Appellant was self-employed as a roofing contractor and lived in
Chaparral, New Mexico.  His shop and
office are located on the property. 
Appellant admitted that he has three DWI convictions, the last being a
felony for which he was given five years=
probation.  Appellant also admitted that
he was also on probation for an assault on his ex-wife.  Appellant met his second wife, Ms. Valles, at a nightclub and they dated for some months
before getting married.  He described
their relationship as fairly good.  Ms. Valles worked at the George Washington nightclub and
Appellant did not want her working there. 
This caused most of the friction in their relationship.  Appellant thought they had been separated for
about a month at the time of Ms. Valles= death.








Appellant stated
that on the night of Ms. Valles= death, he contacted her over the phone
while he was at the Eldorado Lounge.  As a result of their conversation, Ms. Valles took a cab and met him at the bar.  According to Appellant, he was at the bar by
himself and drove to the bar in his truck. 
While he was inside the bar, Homie had his
truck and was supposed to pick him up or meet him there.  After Ms. Valles
arrived they stayed in the bar for some hours. 
Appellant asked Brenda, a waitress, to get them a couple more
drinks.  When he mentioned the name ABrenda,@
Ms. Valles=
became upset and they argued.  They left
the bar at closing time and went outside. 
Appellant was wondering what had happened to Homie
and how he was going to get home or if Homie was
going to pick him up.  Appellant decided
to walk to the 7-Eleven, about a block from the bar, to call Homie.  Appellant did
not know whether Homie was going to be home, but needed
Homie to pick them up.  As they were walking towards the store,
Appellant saw Homie in Appellant=s truck, making a turn at Hondo Pass
and Dyer Street.  Appellant kind of
jumped in front of the truck to get Homie=s attention.  Homie stopped and
Appellant asked to drive the vehicle.  Homie got out, Ms. Valles got in
the truck, then Homie jumped in the back and they
drove off together.








Appellant decided
to drive to his house.  Ms. Valles asked to borrow some money to pay the rent and
Appellant told her he did not have the money with him.  Appellant told her that he would give her the
money tomorrow or another day.  Ms. Valles then told Appellant that if she did not get the
money today, she would not get it another day. 
Appellant stated that Ms. Valles wanted to
keep on drinking and go to Juarez. 
Appellant did not want to go because he had a lot of things to do the
next day.  They argued about the young
lady named Brenda at the nightclub and Appellant told Ms. Valles
that that was only the second time that he had talked to or seen Brenda.  The argument ended for a little while and
they kept driving and getting closer to Appellant=s
house.  Appellant and Ms. Valles then argued about going to Juarez to drink and Ms. Valles became pretty upset. 
According to Appellant, Ms. Valles reached
over and struck him on the side of his head. 
Appellant turned and all of a sudden she was out the door.  Appellant was driving about 40 to 45 miles
per hour and did not have a chance to keep her in the vehicle.  Appellant did not slam on his brakes, but
rather slowed down until the truck came to a stop.  He and Homie got
out of the truck.  Appellant left the
truck ignition running with the parking brake on.  They ran towards where Ms. Valles had fallen, but did not know where exactly and they
were looking for her.  Homie was running ahead of Appellant, who admitted at trial
that he was pretty drunk.  When Appellant
got there, Homie was already holding Ms. Valles and Appellant observed that Ms. Valles
was bleeding some from her head.  Homie said that Ms. Valles was
breathing, but was knocked out. 
Appellant was concerned about broken bones.  He did not know whether she was okay or not,
but there was quite a bit of blood on the ground.  Appellant was also concerned about whether
she had broken her neck.

Appellant thought
that they needed to get Ms. Valles in the truck.  He ran back to the truck and found that it
was locked.  Appellant ran back and told Homie that the truck was locked.  Homie told
Appellant to break into the truck. 
Appellant grabbed a rock, which was covered in blood, and went back to
the truck.  Appellant jumped in the bed
of the truck and threw the rock through the back sliding glass door.  Appellant crawled into the truck, opened it,
got in, and drove back to where Ms. Valles was on the
ground.  Appellant held Ms. Valles=
back and legs while Homie held her head, as they put
her in the back of the truck on a tarp and dragged her towards the front.  They used a ladder and other material to make
a bed for her so she would be straight and not roll around.

Appellant thought
that they should take Ms. Valles to the hospital and
told Homie that they needed to take her there.  Homie told
Appellant that they were going to arrest him because he was drunk and in
violation of his probation.  Appellant
decided to let Homie take Ms. Valles
to the hospital.  Appellant told Homie to take her to Thomason Hospital and that her purse
was in the truck if he needed to provide any identification.  Appellant walked home and went into his
office.  Appellant was waiting for Homie to call once he got Ms. Valles
to the hospital.  Appellant fell asleep
while waiting and was awoken by the neighbor=s
roosters around 5:30 a.m.  He never
received a call and was wondering what had happened.  Appellant called Homie
at his house.  Appellant asked Homie how Ms. Valles was doing
and if she had been okay.  Appellant
learned that she was not okay.








A couple of days
or so later, Appellant saw Homie and wanted to find
out what had happened and to know where his truck was located.  They went to Juarez to the place where Homie had left the truck and found that it was gone.  They went back to Appellant=s house in Chaparral.  At the house, they sat and talked about what
had happened.  Appellant was confused
about what to do and scared.  Appellant
decided to go to Mexico and he and Homie left a
couple of days later for Torreon, Mexico.  Appellant did not hang out with Homie very long in Mexico because what Homie
had done to his wife was bothering Appellant. 
All Homie wanted to do in Mexico was drink and
Appellant was not comfortable with that or with what had happened.  At the time, Appellant disliked Homie very much because of the way he had gotten rid of
Ms. Valles--by dumping her in the river.  Appellant loved his wife and still loves her
and does not feel very happy about all that has happened.  In Mexico, Appellant worked on a farm, fixing
gates and fences for the corral.  He was
there for about a month and a half, but decided not to stay in Mexico because
he did not feel comfortable about what had happened.  Appellant returned, contacted an attorney,
and later turned himself in.  While in
Mexico, Appellant lost weight, but at the time of the incident, he would not
have fit into the jeans recovered from his truck.  Appellant stated that those jeans belonged to
Homie.








On
cross-examination, Appellant discussed in further detail what occurred on the
night Ms. Valles died.  While at the Eldorado
Lounge, Appellant called Ms. Valles twice.  In the first call, she asked him to call her
back and he did.  Before she came over,
Appellant had sent her flowers and when she arrived he paid for her cab ride.  Appellant explained the truck he drives is
under his mother=s name,
but he drives it and pays for it. 
Appellant admitted that he was driving drunk that night after Homie picked them up. 
Appellant stated that they were about two to three miles from his house
when Ms. Valles jumped out of the truck.  Appellant explained that when she went out
the door it was unlocked, but when he and Homie got
out of the truck, one of them accidently hit the
lock.  Appellant did not know how Ms. Valles fell, but recalled that he drove about 75 to 100
feet before stopping.  When Appellant got
out of the truck, he had to open the back door to let Homie
out on the driver=s
side.  Appellant then shut the door while
Homie took off running.  Appellant was behind Homie
and when he got to the scene, Homie was already
holding Ms. Valles. 
Homie was on his knees, holding her head in
his arms.  When Appellant got back to the
truck it was running, but all the doors were locked, including the passenger
side.  Appellant stated that after breaking
the window with the bloody rock, he cleaned the blood off his hands on his
jeans before crawling into the truck through the window.  Appellant also stated that he did not report
his truck stolen after the incident because he knew Homie
had taken it.

During the
cross-examination, Appellant conceded that he did not call the police to report
his wife was missing, did not call her family, and did not call Ms. Diaz.  Appellant admitted that he called his ex-wife
Dolores and had told her that things were not going well for him.  Appellant admitted that he had lied to his
probation officer Ann Marie Richardson about the last time he had seen Ms. Valles.  Appellant
also admitted that he waited a couple of weeks after returning to the U.S.
before turning himself in to the police. 
Appellant talked to his sister, Leticia Fernandez, while he was in
Mexico and knew that the police wanted him for questioning.








Leticia Fernandez
testified that before June 16, 2000, her brother was thirty to forty pounds
heavier.  Ms. Fernandez recalled that her
brother had called her and told her that Ms. Valles
had jumped out of the truck-- information that she relayed to the investigating
detective.  Appellant was recalled to the
stand and testified that he had called his sister and told her that Ms. Valles had jumped out of the truck and that he thought she
was dead.

In rebuttal, the
State called several witnesses who testified that in their opinions Appellant
was not a truthful person.  The State
also recalled Appellant=s
ex-wife, Dolores Hinojos, to testify about Appellant=s assault on her, which Appellant had
described as an accident during his testimony. 
Hinojos recalled that during an argument in
1993, Appellant picked up one of their children=s
bicycles and threw it at her.  The
bicycle hit Ms. Hinojos on the head and caused
bleeding.  Ms. Hinojos
did not think that the incident was an accident.

The jury found
Appellant guilty of murder as charged in Count I of the indictment and assessed
punishment at ninety-nine years=
imprisonment.  Appellant did not file a
motion for new trial and now timely appeals his conviction.

DISCUSSION

Territorial
Jurisdiction

In Issue One,
Appellant argues that the judgment and sentence are void for lack of
territorial jurisdiction.  In Issue Two,
he argues that he is entitled to an acquittal because the evidence is legally
insufficient to establish territorial jurisdiction.    

Standard
of Review








To evaluate the
legal sufficiency of the evidence, we view the evidence and reasonable
inferences therefrom in the light most favorable to
the prosecution to determine whether the verdict is rational.  See Jackson v. Virginia, 443 U.S. 307,
318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560
(1979); Teer v. State, 923 S.W.2d 11,
17 (Tex.Crim.App. 1996).  The jury is entitled to resolve any conflicts
in the evidence, to evaluate the credibility of witnesses, and to determine the
weight of particular evidence.  See
Jones v. State, 944 S.W.2d 642, 647 (Tex.Crim.App. 1996). 
Jurisdiction may be established by circumstantial evidence.  Vaughn v. State, 607
S.W.2d 914, 920 (Tex.Crim.App. [Panel Op.]
1980).

Burden
of Proof

To determine
whether the evidence is legally sufficient, it is necessary to consider the
burden of proof.  As the State
acknowledges, the Court of Criminal Appeals has not explicitly stated the
burden of proof to establish territorial jurisdiction.

In Vaughn,
the Court considered a complaint that the State Afailed
to present sufficient evidence@
to prove territorial jurisdiction.  Id. at 919. 
The Court stated its holding in the following terms:  AViewing
the evidence in the light most favorable to the jury verdict below,
notwithstanding the circumstantial nature of such evidence . . . we believe the
jury could have reasonably concluded that the deceased was in fact
either trampled nearly to death or actually killed in the State of Texas . . .
.@ 
Id.  [Emphasis added][Cite
omitted].  The Court further stated, AWe believe
that jurisdiction, like any other requisite of an offense, can be proven
circumstantially and that our holding herein is consistent with the disposition
of those cases where the State is compelled to prove up venue in a
circumstantial manner.@  Id. at 920.  To support this proposition, the Court cited Edwards
v. State, 427 S.W.2d 629 (Tex.Crim.App.
1968).  In Edwards, the Court held
that venue need not be proven beyond a reasonable doubt.  Rather, A>[i]t is
sufficient if the jury may reasonably conclude . . . that the offense
was committed in the county alleged.=@ 
Edwards, 427 S.W.2d at 634.  [Emphasis added].








In a later case,
the Court held that because venue is not a criminative fact or a constituent
element of the offense, it need only be proven by a preponderance of the
evidence.  This holding was based on Edwards
and Article 13.17 of the Code of Criminal Procedure.  Fairfield v. State,
610 S.W.2d 771, 779 (Tex.Crim.App. [Panel Op.]
1981).  Article
13.17 expressly provides that venue may be proved by a preponderance of the
evidence.  Tex.Code Crim.Proc.Ann.
art. 13.17 (Vernon 1977).

By citing Edwards
and using its language, Vaughn seems to equate the burden of proof for
territorial jurisdiction with the burden of proof for venue.  Although Article 13.17 provides a statutory
basis for deciding venue by a preponderance of the evidence, there is no
comparable statutory basis for deciding territorial jurisdiction by a
preponderance of the evidence.

There are good
reasons not to equate the burdens of proof for venue and territorial
jurisdiction.  Venue refers to the proper county or place of trial; whereas jurisdiction refers
to the power of the court to hear the case.  See Ex parte Watson,
601 S.W.2d 350, 352 (Tex.Crim.App. 1980); see also
People v. McLaughlin, 606 N.E.2d 1357, 1359 (N.Y. 1992).  As the New York Court of Appeals has stated:

The distinct conceptual differences
between venue and territorial jurisdiction and their different jurisprudential
purposes make it virtually impossible to equate the two.  Moreover, when measured in terms of the
effect on the fundamental rights of the defendant, there is a marked contrast
in importance between questions relating to territorial jurisdiction and
venue.  Whether any conduct has been
committed which the State has the power to criminalize and for which it can
commence prosecution against the defendant is certainly not commensurate with a
question relating solely to the place within the State where the trial should
take place.

 

McLaughlin, 606 N.E.2d at 1359.








Most of the states
that have considered the issue have concluded that when there is an evidentiary
dispute as to whether a crime was committed within the prosecuting state=s territorial jurisdiction, the
prosecution must prove territorial jurisdiction beyond a reasonable doubt.  See State v. Butler, 724 A.2d 657, 664
(Md. 1999); McLauglin, 606 N.E.2d at 1359-60; see
also 1 Wayne R. LaFave,
Substantive Criminal Law '
4.1(b), at 267 (2d ed. 2003)(A[T]he
more recent cases have quite consistently held that jurisdiction is a matter
which must be proved beyond a reasonable doubt.@).  But see United States v. Perrien, 274 F.3d 936, 939 n.1 (5th Cir.
2001)(suggesting that the reasonable-doubt standard only applies if territorial
jurisdiction is included as an element of the offense); People v. Cavanaugh,
282 P.2d 53, 59 (Cal. 1955) (holding that territorial jurisdiction need only be
proven by a preponderance of the evidence).[1]  Professor LaFave
explains why the reasonable-doubt standard is appropriate:

Use of the beyond a reasonable doubt
standard minimizes the possibility that a defendant will be tried in one state
for a crime actually committed elsewhere. 
Moreover, it makes it more likely that other states will afford full
faith and credit to decisions regarding criminal jurisdiction, even though they
are not constitutionally required to do so. 
There is also the practical consideration that using a lesser standard
for a portion of the prosecution=s
case and the beyond a reasonable doubt standard for the rest would doubtless
create confusion in the minds of jurors.

 

LaFave, supra, '
4.1(b), at 267.  [Footnotes
omitted].  

While sound policy
considerations support applying the reasonable-doubt standard to territorial
jurisdiction, in light of Vaughn it is difficult to say what standard
applies in Texas.  Nevertheless, for the
reasons explained below, we conclude that the evidence is legally sufficient to
establish territorial jurisdiction in Texas regardless of the standard that is
applied.

Evidence
that Valles=
Death Occurred in This State








Texas has
territorial jurisdiction over an offense if Aeither
the conduct or a result that is an element of the offense occurs inside this
state.@  Tex.Pen.Code
Ann. ' 1.04(a)(1)(Vernon 2003).  If
the offense is criminal homicide, Aresult@ means Aeither
the physical impact causing death or the death itself.@  Tex.Pen.Code Ann. ' 1.04(b).  Thus, Texas had territorial jurisdiction to
prosecute this murder if Valles= death occurred in this state.  Appellant argues that there is no evidence
that Valles died in Texas.

The State
presented evidence that Valles was last seen alive in
Northeast El Paso in the early morning hours of June 16, 2000.  Her dead body was later pulled from the Rio
Grande River behind a restaurant located in El Paso on June 28, 2000.  The medical examiner testified that Valles died from a head injury, not from drowning.  He estimated that the body had been in the
water for more than two weeks, thus indicating that she died very soon after
she was last seen alive.  From this
evidence, a rational jury could have found beyond a reasonable doubt that Valles died in El Paso, Texas.

The State also
presented evidence that the murder weapon and other items associated with the
murder were found in Mexico.  But this
evidence does not compel a conclusion that Valles was
killed in Mexico.  The jury could have
reasonably inferred that Appellant simply disposed of these items there.  To be legally sufficient, the evidence need
not exclude all reasonable alternative hypotheses.  See Geesa
v. State, 820 S.W.2d 154, 155, 161 (Tex.Crim.App.
1991), overruled in part on other grounds by Paulson v. State, 28 S.W.3d
570 (Tex.Crim.App. 2000).








Appellant
testified that Valles injured herself when she jumped
out of his truck approximately two or three miles from his home in Chaparral,
New Mexico.  His testimony indicates that
Valles was alive but unconscious when he last saw
her.  Although this testimony presents
some evidence that the fatal injury occurred in New Mexico, it does not
establish that Valles died in New Mexico.  Moreover, the jury was free to disregard
Appellant=s
testimony.   

In short, the
circumstantial evidence--viewed in the light most favorable to the prosecution
and with proper respect for the jury=s
power to resolve conflicts, evaluate credibility, and weigh the
evidence--supports a finding that Valles died in
Texas beyond a reasonable doubt. 
Therefore, Texas has territorial jurisdiction.

Evidence
That Valles=
Body Was Found in This State

AIf the body of a criminal homicide
victim is found in this state, it is presumed that the death occurred in this
state.@  Tex.Pen.Code Ann. ' 1.04(b).  Therefore, even if there were no evidence
that Valles=
death occurred in Texas, this state may still exercise territorial jurisdiction
if her body was found in this state.  

Detective Ruiz
gave the following testimony:

Q:        Were you called out June 28, 2000, to
1720 West Paisano?

 

A:         Yes, I was.

 

Q:        Where is that located?

 

A:         It=s
just a little bit west of downtown El Paso.

 

Q:        Is it in El Paso County?

 

A:         Yes, ma=am.

 

Q:        The state of Texas?

 

A:         Yes, ma=am.

 

Q:        When you arrived--what is located there?

 








A:         The main, I guess landmark that somebody
can pick up, it was right behind the La Hacienda Restaurant.

 

Q:        On the west side of town?

 

A:         Yes, ma=am.

 

Q:        When you arrived there, what did you
find?

 

A:         I arrived there with reference to a
body that had been pulled out of the canal. 
When I got there, the body had already been removed from that canal, and
it was covered with a sheet, laying on the roadway.

 

Officer Monday testified:

Q:        Okay. 
On June 28, were you called out to take photographs of the body that was
found?

 

A:         Yes. 
On June 28, I went out to the levee road, if you will--it=s behind the La Hacienda Café on West Paisano Street--on a body of a female that had been pulled
from the river that day. 

 

He later identified teeth that were
collected from the skull Athat
was from the body removed from the levee that day from the river [sic].@ 
The parties entered into a stipulation that Athe
individual found dead on June 28, 2000 in the Rio Grande River near 1720 West Paisano is Maria Jovita Valles.@  This stipulation was admitted into evidence.

The testimony of
Detective Ruiz and Officer Monday establishes that they found Valles=
body on a road behind a restaurant located at 1720 West Paisano
in El Paso County, Texas.  Thus, the body
was Afound in
this state@ within
the meaning of Section 1.04(b).








Appellant argues
that the evidence is insufficient to establish that the body was found in Texas
because the body was in the Rio Grande River before it was found by the
officers.  He  points out that the middle of the
River is the boundary between the United States and Mexico.  See Treaty to Resolve Pending Boundary
Differences and Maintain the Rio Grande and Colorado River as the International
Boundary, Nov. 23, 1970, U.S.-Mex., art. II, para. A, 23
U.S.T. 371.  Appellant argues that
the State was therefore required to show that the body was pulled from the
Texas side of the River.  We
disagree.  There is no evidence that the
body had been on the Mexican side of the River. 
It is reasonable to infer that Valles= body was found on the Texas side of
the River because it was pulled to land in Texas.  The stipulation supports this inference by
stating that the body was Ain
the Rio Grande River near 1720 West Paisano.@ 
[Emphasis added].

We conclude that
the evidence is legally sufficient to establish that Valles= body was found in this state, that the
State was therefore entitled to the benefit of the presumption that Valles=
death occurred in this state, and that Appellant failed to rebut the
presumption.   Therefore, Texas has
territorial jurisdiction.[2]

Public
Policy








The conclusion
that Texas has territorial jurisdiction in this case comports with the purpose
of Section 1.04 in general and Section 1.04(b) presumption in particular.  Section 1.04 was derived from the Model Penal
Code.  See LaFave, supra, ' 4.4(b) passim & n.52.  Before the development of the Model Penal
Code and the enactment of Section 1.04, the determination of territorial
jurisdiction was governed by a narrow set of rules that were based on the
notion that each crime has only one situs.  See id. '
4.4(a), at 295; Tex.Pen.Code
Ann. ' 1.04,
practice commentary (Vernon 1974).

The territorial
jurisdiction provisions of the Model Penal Code and Section 1.04 were designed
to broaden the concept of territorial jurisdiction.  See LaFave, supra, '
4.4(b) passim; see also 6 Michael
B. Charlton, Texas Practice:  Texas
Criminal Law '
1.3 (2001) (commenting that Section 1.04 broadly defines the state=s territorial jurisdiction).  According to the practice commentary for
Section 1.04:

Section 1.04 departs
from prior law, which limited jurisdictional provisions to specific offenses,
by establishing a broad jurisdictional base for the prosecution in Texas of
offenses involving persons, property, and public interests in this state.  . . . 
The section includes all jurisdictional provisions in prior law and in
some instances (e. g., prosecution for homicide when the body is found
in the state) broadens that jurisdiction. 
The primary policy considerations underlying this section are (1) the
state seeking to prosecute for an offense should have a substantial interest in
or connection with the criminal event, and (2) law enforcement should be
facilitated by plugging gaps in the existing law when a course of conduct goes
beyond the boundaries of a single state. 
A basic tenet of Section 1.04 is that an actor=s
location within or without the state when the offense is committed and his
legal relation to the offense (perpetrator or party) are immaterial for
jurisdictional purposes if the formal requisites of the statute are met.  [Citation omitted].

 

Tex.Pen.Code Ann. '
1.04, practice commentary; see also Devine v. State, 786 S.W.2d
268, 270 (Tex.Crim.App. 1989)(gleaning
legislative intent from a practice commentary).   








The first policy
underlying Section 1.04 is that the prosecuting state should have a substantial
interest in or connection with the crime. 
See Tex.Pen.Code Ann. '
1.04, practice commentary.  This policy
is founded on due process.  See Charlton, supra, ' 1.3. 
Texas certainly has a substantial interest in and connection with this
crime.  Valles was living in Texas
when she was murdered and was last seen alive in Texas.  Her disappearance was therefore investigated
by Texas law enforcement personnel, who eventually discovered her dead body in
Texas.

The second policy
underlying Section 1.04 is that jurisdictional gaps should be plugged.  See Tex.Pen.Code Ann. '
1.04, practice commentary.  One of the
ways in which Section 1.04 accomplishes this objective is through the
presumption that death occurred in this state if the body was found in this
state.  This presumption is based on the
idea that a person should not be able to avoid or delay prosecution, and
thereby confound justice, by murdering the victim in one jurisdiction and
placing the dead body in another.  See
McKinney v. State, 553 N.E.2d 860, 862 (Ind.Ct.App.
1990)(construing a comparable statute).  This is particularly important in El Paso
County, where the Rio Grande River forms the border separating Texas from
Mexico.  Appellant argues that Texas
cannot prosecute him because Valles= body may have been on the
Mexico side of the River before it was found by law enforcement personnel in
Texas.  This argument makes jurisdiction
dependent upon nice distinctions regarding the positioning of the body and the
vagaries of the Rio Grande River, effectively turning the River itself into a
jurisdictional gap.  The argument is thus
inconsistent with the purpose of Section 1.04. 
Accordingly, Issues One and Two are overruled.

Motion
for Directed Verdict and Ineffective Assistance of Counsel








In Issue Three,
Appellant argues that the trial court erred in not allowing his counsel to
renew his motion for directed verdict because the evidence was legally and
factually insufficient to prove the offense occurred in El Paso County.  Appellant asserts that if defense counsel had
been given the opportunity to make his motion for directed verdict, he clearly
would have raised venue and jurisdiction matters to preserve the issue for
review.  In Issue Four, Appellant asserts
that by failing to object to the trial court=s
refusal to allow him to renew his motion and by not specifically alleging the
State=s failure
to prove venue in his first motion for directed verdict, his trial counsel
provided ineffective assistance of counsel. 
Since both issues presented concern venue in this cause we will address
the issues together.

In the State=s response, it argues the trial court
did not refuse to allow defense counsel to renew the motion, but rather
expressly overruled the renewed motion itself. 
We agree.  At the close of
evidence, the following exchanged occurred:

Defense
counsel:           I would just ask to
renew our motion for acquittal.

 

The
Court:                    You mean the
motion for directed verdict?

 

Defense
counsel:           Yes.

 

The
Court:                    Denied.  We are going to proceed.

 

From the context of the ruling, it
appears to this Court that the trial court was expressly denying Appellant=s motion for directed verdict.  In Appellant=s
first motion for directed verdict, made at the close of the State=s case-in-chief, defense counsel argued
that there was insufficient circumstantial evidence to show that Appellant
killed the victim.  The trial court
denied that motion and apparently denied the motion for a second time.  Issue Three is overruled.

Appellant asserts
in Issue Four that he was provided ineffective assistance of counsel because
his counsel was deficient and not reasonably effective due to failure to
specifically allege the lack of proof on venue in El Paso County in the motion
for directed verdict.








We review claims
of ineffective assistance of counsel under the two-prong test set out by the
United States Supreme Court in Strickland v. Washington, 466 U.S. 668,
104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and adopted by
Texas in Hernandez v. State, 726 S.W.2d 53, 57 (Tex.Crim.App.
1986).  First, the defendant must show
that trial counsel=s
performance was deficient, that is, counsel=s
representation fell below an objective standard of reasonableness.  Thompson v. State, 9
S.W.3d 808, 812 (Tex.Crim.App. 1999); Strickland,
466 U.S. at 687-88, 104 S.Ct. at 2064.  Second, the defendant must show that counsel=s deficient performance prejudiced the
defense.  Strickland,
466 U.S. at 687, 104 S.Ct. at 2064; Jackson v.
State, 877 S.W.2d 768, 771 (Tex.Crim.App. 1994).  This requires the defendant to show there is
a reasonable probability that, but for counsel=s
unprofessional errors, the result of the proceeding would have been
different.  Strickland, 466 U.S.
at 694, 104 S.Ct. at 2068; Jackson, 877 S.W.2d at 771.  A
reasonable probability is a probability sufficient to undermine confidence in
the outcome.  Strickland, 466 U.S.
at 694, 104 S.Ct. at 2068; Jackson, 877 S.W.2d at 771.








It is the
defendant=s burden
to prove ineffective assistance of counsel by a preponderance of the
evidence.  Thompson, 9 S.W.3d at 813.  In
reviewing a claim of ineffective assistance of counsel, we must indulge a
strong presumption that counsel=s
conduct falls within the wide range of reasonable professional assistance and
the appellant must overcome the presumption that the challenged conduct might
be considered sound trial strategy.  Id.; Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. 
Any allegation of ineffectiveness must be firmly founded and
affirmatively demonstrated in the record to overcome this presumption.  Thompson, 9 S.W.3d at 813; see
Jackson, 877 S.W.2d at 771.  In the
majority of instances, this task is extremely difficult because Athe record on direct appeal is simply
undeveloped and cannot adequately reflect the failings of trial counsel.@ 
Thompson, 9 S.W.3d at 813-14.  When faced with a silent record as to counsel=s strategy, this Court will not
speculate as to the reasons for counsel=s
actions.  See Jackson, 877 S.W.2d at 771. 
The Court of Criminal Appeals in Thompson, further advises that A[a]n appellate court should be
especially hesitant to declare counsel ineffective based upon a single alleged
miscalculation during what amounts to otherwise satisfactory representation,
especially when the record provides no discernible explanation of the
motivation behind counsel=s
actions--whether those actions were of strategic design or the result of
negligent conduct.@  Thompson, 9 S.W.3d
at 814.  In this case, Appellant
did not file a motion for new trial to challenge the alleged ineffectiveness of
his counsel.  The record before this
Court does not contain trial counsel=s
explanations of the reasons for the inaction alleged as error, therefore it
will be difficult for Appellant to rebut the strong presumption that trial
counsel=s conduct
falls within the wide range of reasonable professional assistance.  See id.  

Failure
to Challenge Venue in the Motion for Instructed Verdict

Article 13.05 of
the Texas Code of Criminal Procedure provides that Acriminal
homicide committed wholly or in part outside this State, under circumstances
that give this State jurisdiction to prosecute the offender, may be prosecuted
in the county where the injury was inflicted, or in the county where the
offender was located when he inflicted the injury, or in the county where the
victim died or the body was found.@  Tex.Code Crim.Proc.Ann.
art. 13.05 (Vernon 1977).

Although defense
counsel did not challenge the venue issue through his motion for directed
verdict, defense counsel in his closing argument argued at length that the
State had failed to prove venue in this case. 
Defense counsel=s
jury argument included the following remarks:








What evidence do you
have--has the State produced to you that this--if it was a crime--occurred in
Texas?  They found a body.  However, I think you-all are familiar with
the area.  The New Mexico line is not too
far up from the La Hacienda.  It=s between
-- at Anthony, that area.  And
they never even told you if the body was found on the Mexican side of the river
or the American side of the river.  Not
one officer testified this crime occurred in Texas and the body was actually in
Texas.  It was just,
we know it was in a ditch by the La Hacienda.

Everybody that=s been to the La Hacienda Restaurant
knows that on one side is Mexico and on the other side is the United States . .
. .

There was nobody here
to testify that it was actually on the American side of the river.

 

Apparently, Appellant=s trial counsel brought to the jury=s attention the State=s alleged failure to prove venue for
its determination, rather than asserting this challenge to the trial judge in
his motion for instructed verdict. 
Without any evidence in the record on direct appeal regarding counsel=s reasoning of his action or inaction,
we find that Appellant has failed to defeat the strong presumption that his
trial counsel=s
performance falls within the wide range of reasonable professional
assistance.  See Thompson, 9 S.W.3d at 814. 
Appellant=s Issue
Four is overruled.

Sufficiency
of the Evidence

In Issues Five and
Six, Appellant challenges the legal and factual sufficiency of the evidence to
sustain his conviction for murder.

Standards
of Review 








As noted above, in
reviewing the legal sufficiency of the evidence, we must view the evidence in
the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson,
443 U.S. at 319, 99 S.Ct. at 2788-89.  We do not resolve any conflict of fact or
evaluate the credibility of any witnesses, as this was the function of the trier of fact and will be given great deference.  Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App.
1992); Matson v. State, 819 S.W.2d 839, 843 (Tex.Crim.App.
1991).  Instead, our duty is to
determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence
admitted at trial in the light most favorable to the verdict.  Adelman, 828 S.W.2d at 421-22. 
In so doing, any inconsistencies in the evidence are resolved in favor
of the verdict.  Matson, 819 S.W.2d at 843. 
The same standard of review applies to cases involving circumstantial
evidence.  Burden v.
State, 55 S.W.3d 608, 613 (Tex.Crim.App. 2001); Geesa v. State, 820 S.W.2d 154, 159 (Tex.Crim.App. 1991), overruled in part on other grounds
by Paulson v. State, 28 S.W.3d 570 (Tex.Crim.App.
2000).

In reviewing a
factual sufficiency challenge, we do not view the evidence in the light most
favorable to the verdict.  Clewis
v. State, 922 S.W.2d 126, 129 (Tex.Crim.App.
1996).  Rather, we ask Awhether a neutral review of all of the
evidence, both for and against the finding, demonstrates that the proof of
guilt is so obviously weak as to undermine confidence in the jury=s determination or the proof of guilt,
although adequate if taken alone, is greatly outweighed by contrary proof.@ 
Johnson v. State, 23 S.W.3d 1, 11 (Tex.Crim.App. 2000). 
AThe court
reviews the evidence weighed by the jury that tends to prove the existence of
the elemental fact in dispute and compares it with the evidence that tends to
disprove that fact.@  Id. at 7.  We are authorized to disagree with the fact
finder=s
determination; however, our review must employ appropriate deference to prevent
this court from substituting its judgment for that of the fact finder and any
evaluation should not substantially intrude upon the fact finder=s role as the sole judge of weight and
credibility given to any witness testimony. 
Id.; Jones v. State, 944 S.W.2d 642, 647-48 (Tex.Crim.App. 1996), cert. denied, 522 U.S. 832, 118
S.Ct. 100, 139 L.Ed.2d 54 (1997).  

Legal
Sufficiency








In Issue Five,
Appellant argues that the trial court erred in denying his motion for an
instructed verdict.  Specifically,
Appellant asserts that the State produced no evidence that would show he had
anything to do with the death of his wife.[3]  A challenge to the trial court=s ruling on a motion for instructed
verdict is actually a challenge to the legal sufficiency of the evidence, therefore we apply the same standard of
review.  Madden v. State, 799
S.W.2d 683, 686 (Tex.Crim.App. 1990), cert. denied,
499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483
(1991).  

Murder


In this case, the
elements of the offense of murder were set out in the indictment which alleged
in pertinent part that Appellant did unlawfully then and there:

[I]ntentionally
and knowingly cause the death of an individual, namely, MARIA JOVITA VALLES, by
striking the head of MARIA JOVITA VALLES with a rock,

                                                              .               .               .

 

[D]id then and there, with intent to
cause serious bodily injury to an individual, namely, MARIA JOVITA VALLES,
commit an act clearly dangerous to human life, to wit: by striking MARIA JOVITA
VALLES about the head with a rock, that caused the death of the said MARIA
JOVITA VALLES . . . .[4]

 

See Tex.Pen.Code Ann. '
19.02(b)(1), (2)(Vernon 2003).








The State
presented a circumstantial evidence case and as such, the cumulative force of
all the surrounding additional facts and incriminating circumstances may be
sufficient to support the jury=s
conclusion of guilt.  See Barnes v.
State, 876 S.W.2d 316, 321 (Tex.Crim.App. 1994), cert.
denied, 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d
110 (1994); Beardsley v. State, 738 S.W.2d 681, 685 (Tex.Crim.App.
1987).  

Viewing the
evidence in the light most favorable to the verdict, we find that there was
sufficient circumstantial evidence for any rational trier
of fact to find the essential elements of the offense of murder, as alleged in
Count I of the indictment, beyond a reasonable doubt.  Appellant and Ms. Valles
were married in January 2000, but by June 15, 2000, Ms. Valles
had recently moved out of the marital home. 
On the evening of June 15, 2000, Ms. Valles
joined Appellant at the Eldorado Lounge and he paid
for her cab ride there.  Witnesses who
last saw the couple together at the Eldorado Lounge
described their interactions as argumentative and as the night progressed,
amorous.  Appellant and Ms. Valles were seen leaving the bar together, holding hands
and walking towards Appellant=s
truck.  This was the last time that Ms. Valles was seen alive. 
Maria Diaz, Ms. Valles= friend and babysitter for the evening,
attempted to return Ms. Valles= two children the next morning, but
found that Ms. Valles was not at her apartment.  Ms. Diaz thought this was unusual and later
that night called the police to report Ms. Valles as
missing.  Ms.Valles= body was found two weeks later dressed
in the same clothing that witnesses had seen her wearing that night she
disappeared.








The State in its
case-in-chief also presented physical evidence linking Appellant to the murder
weapon alleged in the indictment.  Police
offficers testified that on June 20, 2000, they went
to Juarez, Mexico to view a truck found by Juarez police at a bus station on
June 16, 2000.  This truck was later
identified as Appellant=s.  The officers recovered a pair of bloodstained
jeans, size 33 x 32, a heavily bloodstained sharp-edged rock,
approximately ten inches long and two to three inches wide, and socks with
blood and dirt stains.  DNA analysis of
the blood on these items was shown to be consistent with the victim=s DNA profile.  Based on examination of the victim=s body, Dr. Juan Contin
testified that the only significant injury was a fracture running from the left
side of the victim=s skull
through its base to the other side.  The
impact of the fracture was on the left side of the skull.  Dr. Contin
concluded that the victim had died of a head injury and the manner of death was
homicidal.  Dr. Contin
concluded that such an injury would result in a lot of bleeding.  Dr. Contin agreed
that the rock admitted into evidence was capable of causing death or serious
bodily injury.  Detention officer Steven
Elliot testified that when Appellant was booked into the detention facility
upon his arrest, Appellant was wearing a pair of jeans size 33 x 32.

Through testimony
from witnesses who had spoken with Appellant while Ms. Valles
was missing, the State produced evidence of suspicious conduct by Appellant to
indicate a consciousness of guilt.  Dolores
Hinojos, Appellant=s
ex-wife, testified that early on the morning of June 16, 2000, she received a
telephone call from Appellant asking her to take care of his boys.  When Ms. Hinojos
asked if something was wrong, Appellant replied that things were not going well
for him.  Hinojos
recalled that Appellant sounded sad and depressed.  Ann Marie Richardson, Appellant=s probation officer, spoke with
Appellant on June 19, 2000, at which time she questioned Appellant about the
missing Ms. Valles=
whereabouts.  Appellant lied to
Ms. Richardson and told her he had not seen nor heard from Ms. Valles for a week and a half.  Ms. Richardson noticed that Appellant
continually referred to Ms. Valles in the past tense,
which led her to suspect that Ms. Valles was dead.








Any rational trier of fact could reasonably conclude from the cumulative
force of the facts and incriminating circumstances detailed above the essential
elements of the offense of murder in this case beyond a reasonable doubt.  Appellant was the last to see Ms. Valles, his estranged wife, alive.  From his actions after her disappearance, a
jury could reasonably infer that Appellant was hiding something or had a
consciousness of guilt.  Moreover, the
physical evidence recovered by police officers pointed to Appellant.  Accordingly, we conclude that the evidence is
legally sufficient to support Appellant=s
conviction.  Issue Five is Overruled.

Factual
Sufficiency








In Issue Six,
Appellant argues that the entire record, in particular the contradictory
evidence presented by Appellant at trial, overwhelmingly contradicts the
verdict as to make the verdict wrong and unjust.[5]  The State presented a circumstantial evidence
case in which there was no direct evidence linking Appellant to Ms. Valles=
death.  Fingerprints collected from
Appellant=s truck
were found to be of no evidentiary value. 
Appellant=s version
of events places him, Homie, and Ms. Valles in his pickup truck on the evening of Ms. Valles=
death.  According to Appellant, Ms. Valles was asking for rent money and wanting to go to
Juarez to drink.  Inexplicably, Ms. Valles jumped out of Appellant=s
truck, which was traveling at a high rate of speed.  Appellant slowed down his vehicle, put on the
parking brake, left the vehicle running, but accidently
locked the door.  Homie
reached Ms. Valles first and held her in his
arms.  Appellant recalled that there was
a lot of blood on the ground.  Appellant
used a rock covered in Ms. Valles= blood to break the back window of the
cab.  Before crawling in, Appellant wiped
the blood on his hands onto his jeans. 
After he and Homie loaded Ms. Valles into the bed of the truck, despite Appellant=s concern that she had broken her neck
in the fall, Homie drove away, while Appellant walked
home.  From his testimony, Appellant was
asking the jury to infer that Ms. Valles= head injury was self-inflicted and
that Homie had disposed of her body in the river
instead of seeking medical assistance.

The jury is the
sole judge of witness credibility and is free to believe or disbelieve any
witness.  Jones v. State, 984
S.W.2d 254, 258 (Tex.Crim.App. 1998); Sharp v.
State, 707 S.W.2d 611, 614 (Tex.Crim.App. 1986), cert.
denied, 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d
159 (1988).  The jury apparently did not
accept Appellant=s version
of events and we give appropriate deference to the jury with respect to
credibility and weighing of evidence. 
Moreover, Appellant=s
testimony is contrary to the physical evidence recovered from Appellant=s truck, namely that tests of the truck=s interior found no presence of
blood.  Considering all the evidence
presented at trial, we conclude that the evidence was factually sufficient to
support Appellant=s
conviction because it is not so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  Issue Six is overruled.

Circumstantial
Evidence Instruction

In Issue Seven,
Appellant asserts that the trial court erred in refusing his requested
instruction on circumstantial evidence. 
We disagree.

Appellant=s counsel requested the following
instruction: 








In the circumstantial evidence case,
you are instructed that if the evidence supports a reasonable inference other
than the defendant=s guilt,
then the State has failed to meet its burden of proof of the elements of the
offense beyond a reasonable doubt.  It
the evidence supports a reasonable inference other than the  defendant=s
guilt, you will say by your verdict not guilty.

 

The trial court denied the
requested instruction.

The Court of
Criminal Appeals in Hankins, observed that
circumstantial evidence can be as strong and conclusive as direct evidence and
that jurors are not required to give greater weight to direct evidence than
circumstantial evidence.  Hankins v.
State, 646 S.W.2d 191, 198 (Tex.Crim.App. 1983)(Opin. on reh=g), abrogation on other grounds
recognized by Markham v. State, 751 S.W.2d 190, 192 (Tex.Crim.App. 1988). 
The Court in Hankins held that a circumstantial evidence charge
is not required, was valueless, and only served to confuse the jury.  Id. at 198, 199.  The Court of Criminal Appeals in Geesa, observed its abrogation of the circumstantial
evidence charge in its Hankins decision. 
Geesa, 820 S.W.2d at 155-56, overruled
in part on other grounds by Paulson v. State, 28 S.W.3d 570 (Tex.Crim.App. 2000)(overruling the
reasonable doubt instruction mandated in Geesa).  In light of these holdings, the trial court
did not err in refusing Appellant=s
circumstantial evidence instruction. 
Issue Seven is overruled.  

Having overruled
all of Appellant=s issues
for review, we affirm the trial court=s
judgment.

 

April
8, 2004

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 1

Larsen, McClure, and Chew, JJ.

 

(Publish)











[1]
There is an important corollary to the rule that territorial jurisdiction must
be proved beyond a reasonable doubt.  The
rule only applies if there is a factual dispute regarding territorial
jurisdiction and the matter has been put in issue by the defendant.  See Butler, 724 A.2d
at 663; LaFave,
supra, ' 4.1(b),
at 265.  If no dispute exists, the
court need not submit the issue to the jury. 
See Butler, 724 A.2d at 661-62.





[2]
Although the State asserted during its closing argument that Texas has
territorial jurisdiction because Valles= body had been found in Texas, the
court did not instruct the jury regarding the Section 1.04(b) presumption.  See Tex.Pen.Code Ann. '
2.05 (Vernon 2003) (requiring the court to instruct the jury regarding
presumptions).  On appeal, Appellant does
not argue that the State cannot rely on the presumption because it was not
included in the jury charge; he only argues that there is no evidence to
establish the presumption.  





[3]
We note that in Appellant=s
brief under Issue Five, he also challenges the legal sufficiency of the
evidence regarding jurisdiction and venue. 
Appellant=s
jurisdiction complaint has been addressed in our review of his Issues One and
Two.  In Issue Four, Appellant argued
that his counsel=s failure
to specifically challenge venue amounted to ineffective assistance of
counsel.  Nowhere in his brief does
Appellant argue that counsel has preserved appellate review on the issue of
venue.  In his motion for instructed
verdict, Appellant=s trial
counsel did not challenge proof of venue and as discussed above in our review
of Issue Four, the record on direct appeal is silent as to trial counsel=s reasoning for his action.  Therefore, we presume venue was proven in the
trial court as the record does not affirmatively show otherwise nor was venue
disputed in the trial court.  See Tex.R.App.P. 44.2(c)(1); Valdez
v. State, 993 S.W.2d 346, 349 (Tex.App.--El Paso
1999, pet. ref=d).





[4]
As previously noted, Count II of the indictment was dismissed after the jury
found Appellant guilty as alleged in Count I. 






[5]
In its brief, the State contends that because Appellant failed to properly
brief his factual sufficiency complaint, nothing is presented for this Court=s review.  It appears that Appellant set out only the
factual sufficiency standard of review in Issue Six and by mistake included the
argument on this issue at the end of his briefing on Issue Seven.  In this particular instance, we will consider
the merits of Appellant=s
factual sufficiency point because it is readily apparent that Appellant
intended to provide an argument in support of his factual sufficiency
complaint, which appears on pages twenty-three to twenty-six of his brief.